1  John E. Schmidtlein (CA State Bar No. 163520)
2  Benjamin M. Greenblum (*pro hac vice*)
   WILLIAMS & CONNOLLY LLP
3  725 Twelfth Street, N.W.
   Washington, DC 20005
4  Telephone:  (202) 434-5000
   Facsimile:  (202) 434-5029
5  Email:  jschmidtlein@wc.com
              bgreenblum@wc.com
6
7  *Attorneys for Defendants Google LLC*
   *and Alphabet Inc.*
8
9
10
11                 **UNITED STATES DISTRICT COURT**
12              **NORTHERN DISTRICT OF CALIFORNIA**
13                     **SAN JOSE DIVISION**
14
15                                    )  Case No. 5:20-cv-03556-BLF
                                      )
16  IN RE GOOGLE DIGITAL             )
    ADVERTISING ANTITRUST            )
17  LITIGATION                       )  **DEFENDANTS' NOTICE OF MOTION**
                                      )  **AND MOTION TO DISMISS:**
                                      )  **MEMORANDUM OF POINTS AND**
18                                    )  **AUTHORITIES IN SUPPORT THEREOF**
                                      )
19                                    )  Hearing Date:     April 8, 2021
20                                    )  Time:             9:00am
                                      )  Place:            Courtroom 3
21                                    )  Judge:            Hon. Beth Labson Freeman
22  _____
23
24
25
26
27
28

## NOTICE OF MOTION

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on April 8, 2021, at 9:00 a.m., or as soon thereafter as this matter may be heard, either in Courtroom 3 of this Court, located at 280 South 1st Street, San Jose, California, or by videoconference or teleconference (if the Court prefers), Defendants Google LLC and Alphabet Inc. will and hereby do move the Court for an order dismissing Plaintiffs' Consolidated Class Action Complaint without leave to amend.

This Motion is made pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) on the grounds that Plaintiffs fail to plausibly plead a facially sustainable relevant market, antitrust injury, or any anticompetitive conduct by Defendants, each of which is fatal to Plaintiffs' Sherman Act and Unfair Competition Law claims.  Several of the Plaintiffs also are bound to arbitrate any claims they would otherwise have.

The Motion is based upon this Notice; the accompanying Memorandum of Points and Authorities; the Declaration of Michael Kreins; any reply memorandum; the pleadings and files in this action; and such other matters as may be presented at or before the hearing.

DATED:  November 9, 2020

**WILLIAMS & CONNOLLY LLP**

By: /s/ John E. Schmidtlein
John E. Schmidtlein (CA State Bar No. 163520)
Benjamin M. Greenblum (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone:  (202) 434-5000
Facsimile:  (202) 434-5029
Email:  jschmidtlein@wc.com
              bgreenblum@wc.com

*Attorneys for Defendants Google LLC
and Alphabet Inc.*

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................................1

INTRODUCTION ..........................................................................................................................1

BACKGROUND ............................................................................................................................1

LEGAL STANDARD .....................................................................................................................4

ARGUMENT .................................................................................................................................4

I.      PLAINTIFFS FAIL TO ADEQUATELY PLEAD A SHERMAN ACT CLAIM. ...............4

        A.      Plaintiffs Fail To Allege a Plausible "Relevant Market." .........................................4

                1.      Plaintiffs Have Not Adequately Alleged Facts To Support a Relevant Market
                        Comprising a Collection of Products and Services Used by Different
                        Customers for Different Purposes. .................................................................5

                2.      The "Online Display Advertising Services" Market Is Facially Unsustainable
                        for Excluding Economic Substitutes. ............................................................6

                        a.      The Proposed Relevant Market Excludes Alternative Means of
                                Accessing Online Display Advertising. ..............................................6

                        b.      The Proposed Market Excludes Alternative Forms of Advertising. ...7

        B.      Plaintiffs Fail To Plead Antitrust Standing. ...............................................................9

        C.      Plaintiffs Fail To Plead Actionable Anticompetitive Conduct. .................................11

                1.      Plaintiffs Fail To Plead A Claim for "Monopoly Leveraging." ....................11

                        a.      Plaintiffs' Leveraging Allegations Are Legally Insufficient. ............12

                        b.      Plaintiffs Have Failed To Adequately Plead a Tying Claim. ............13

                2.      Plaintiffs Fail To Plead a Denial of Interoperability Claim. ........................15

                3.      Plaintiffs Fail To Plead a Claim Based on the Alleged Failure To Disclose
                        Various Data and Information to Competitors. ...............................................16

                4.      Plaintiffs Fail To Plead an Antitrust Claim Based on Google's Acquisitions
                        ........................................................................................................................17

                5.      Plaintiffs' Conclusory Allegations as to Google "Rigging Auctions" Fail. ...20

II.     PLAINTIFFS FAIL TO PLAUSIBLY PLEAD VIOLATIONS OF THE UCL. ..................20

III.    ALL PLAINTIFFS OTHER THAN HANSON ARE BOUND TO ARBITRATE. ..............21

CONCLUSION ............................................................................................................................24

1

# TABLE OF AUTHORITIES

2

## CASES

3

*Adtrader, Inc. v. Google LLC*,
    2018 WL 1876950 (N.D. Cal. Apr. 19, 2018) ............................................................. 22

4

5

*Ajzenman v. Office of Comm'r of Baseball*,
    2020 WL 6037140 (C.D. Cal. Sept. 14, 2020) ........................................................... 24

6

*Ala. Airlines, Inc. v. United Airlines, Inc.*,
    948 F.2d 536 (9th Cir. 1991) ..................................................................................... 12

7

8

*Allied Orthopedic Appliances v. Tyco Health Care Grp.*,
    592 F.3d 991 (9th Cir. 2010) ............................................................................... 15, 16

9

*Apple iPod iTunes Antitrust Litig.*,
    2009 WL 10678940 (N.D. Cal. Oct. 30, 2009) ......................................................... 14

10

11

*Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*,
    241 F.3d 696 (9th Cir. 2001) ....................................................................................... 9

12

*Aya Healthcare Servs. v. AMN Healthcare, Inc.*,
    2017 WL 6059145 (S.D. Cal. Dec. 6, 2017) ............................................................. 10

13

14

*Blair v. Rent-A-Center, Inc.*,
    928 F.3d 819 (9th Cir. 2019) ..................................................................................... 23

15

16

*Carefusion Corp. v. Medtronic, Inc.*,
    2010 WL 4509821 (N.D. Cal. Nov. 1, 2010) ............................................................ 18

17

*Catch Curve, Inc. v. Venali, Inc.*,
    519 F. Supp. 2d 1028 (C.D. Cal. 2007) ..................................................................... 14

18

*Chavez v. Whirlpool Corp.*,
    93 Cal. App. 4th 363 (2001) ...................................................................................... 21

19

20

*Complete Entm't Res. v. Live Nation Entm't, Inc.*,
    2016 WL 3457177 (C.D. Cal. May 11, 2016) ........................................................... 19

21

*Eastman v. Quest Diagnostics Inc.*,
    724 F. App'x 556 (9th Cir. 2018) .............................................................................. 18

22

23

*Facebook, Inc. v. Power Ventures, Inc.*,
    2010 WL 3291750 (N.D. Cal. July 20, 2010) ........................................................... 15

24

*Feitelson v. Google Inc.*,
    80 F. Supp. 3d 1019 (N.D. Cal. 2015) ................................................................ 14, 20

25

26

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ..................................................................................... 15

27

*Garcia v. Comcast Cable Commc'n Mgmt. LLC*,
    2017 WL 1210044 (N.D. Cal. Mar. 31, 2017) .......................................................... 22

28

*Garrison v. Oracle Corp.*,
   159 F. Supp. 3d 1044 (N.D. Cal. 2016)..................................................................................19

*Golden Gate Pharm. Servs. v. Pfizer, Inc.*,
   433 F. App'x 598 (9th Cir. 2011)..........................................................................................5

*Hicks v. PGA Tour, Inc.*,
   897 F.3d 1109 (9th Cir. 2018)........................................................................................*passim*

*In re Flash Memory Antitrust Litig.*,
   643 F. Supp. 2d 1133 (N.D. Cal. 2009)..............................................................................11

*In re Graphics Processing Units Antitrust Litig.*,
   527 F. Supp. 2d 1011 (N.D. Cal. 2007)..............................................................................11

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
   933 F.3d 1136 (9th Cir. 2019)...............................................................................................4

*John Doe I v. Abbott Labs.*,
   571 F.3d 930 (9th Cir. 2009)................................................................................................12

*Johnmohammadi v. Bloomingdale's, Inc.*,
   755 F.3d 1072 (9th Cir. 2014).............................................................................................21

*Johnson v. JP Morgan Chase Bank, N.A.*,
   2018 WL 4726042 (C.D. Cal. Sept. 18, 2018)..................................................................24

*Kilgore v. KeyBank, N.A.*,
   718 F.3d 1052 (9th Cir. 2013).............................................................................................22

*LiveUniverse v. MySpace, Inc.*,
   304 F. App'x 554, 556–57 (9th Cir. 2008).................................................................15, 21

*MetroNet Servs. Corp. v. Qwest Corp.*,
   383 F.3d 1124 (9th Cir. 2004).............................................................................................17

*Mohamed v. Uber Techs., Inc.*,
   848 F.3d 1201 (9th Cir. 2016).............................................................................................22

*Novation Ventures, LLC v. J.G. Wentworth Co.*,
   711 F. App'x 402 (9th Cir. 2017)........................................................................................21

*Packaging Sys. v. PRC-Desoto Int'l*,
   268 F. Supp. 3d 1071 (C.D. Cal. 2017)..............................................................................13

*Paladin Assocs. v. Mont. Power Co.*,
   328 F.3d 1145 (9th Cir. 2003).........................................................................................5, 13

*Parreno v. Berryessa Union Sch. Dist.*,
   2010 WL 532376 (N.D. Cal. Feb. 8, 2010)........................................................................24

*Payment Logistics Ltd. v. Lighthouse Network, LLC*,
   2018 WL 5311907 (S.D. Cal. Oct. 24, 2018)......................................................................6

*PNY Techs. v. SanDisk Corp.*,
   2012 WL 1380271 (N.D. Cal. Apr. 20, 2012) ............................................................. 11

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
   2020 WL 3969064 (N.D. Cal. July 8, 2020) ................................................*passim*

*Rogers v. Lyft, Inc.*,
   452 F. Supp. 3d 904 (N.D. Cal. 2020) ...........................................................24, 25

*Ryan v. Microsoft Corp.*,
   147 F. Supp. 3d 868 (N.D. Cal. 2015) ...........................................................19, 20

*Sahagian v. Genera Corp.*,
   2009 WL 9504039 (C.D. Cal. July 6, 2009) ................................................................ 9

*Samsung Elecs. Co. v. Panasonic Corp.*,
   747 F.3d 1199 (9th Cir. 2014) ................................................................. 20

*Shierkatz Rllp v. Square, Inc.*,
   2015 WL 9258082 (N.D. Cal. Dec. 17, 2015) ............................................. 22

*Sidibe v. Sutter Health*,
   4 F. Supp. 3d 1160 (N.D. Cal. 2013) ...........................................................13, 21

*Smilecare Dental Grp. v. Delta Dental Plan of Cal.*,
   858 F. Supp. 1035 (C.D. Cal. 1994) .......................................................... 18

*Snyder v. Nationstar Mortg.*,
   2015 WL 7075622 (N.D. Cal. Nov. 13, 2015) ................................................ 24

*Somers v. Apple, Inc.*,
   729 F.3d 953 (9th Cir. 2013) ....................................................................... 9

*Sponheim v. Citibank, N.A.*,
   2019 WL 2498938 (C.D. Cal. June 10, 2019) ............................................... 25

*Tompkins v. 23andMe, Inc.*,
   840 F.3d 1016 (9th Cir. 2016) ................................................................. 23

*Trudeau v. Google LLC*,
   349 F. Supp. 3d 869 (N.D. Cal. 2018) ...................................................21, 22, 23

*Ulbrich v. Overstock.Com, Inc.*,
   887 F. Supp. 2d 924 (N.D. Cal. 2012) ....................................................... 23

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ................................................................. 16

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) ...........................................................................12, 15

*Wright v. Sirius XM Radio Inc.*,
   2017 WL 4676580 (C.D. Cal. June 1, 2017) ................................................. 25

- v -

*Z Techs. Corp. v. Lubrizol Corp.*,
 753 F.3d 594 (6th Cir. 2014) ...................................................................................... 19

## OTHER AUTHORITIES

15 U.S.C. § 15(b) ............................................................................................... 15, 19

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Plaintiffs' Consolidated Class Action Complaint ("CAC," ECF No. 35) stretches across several business units, products, acquisitions, purported markets, and decades (reaching back to 2007), aggregating disparate and unrelated allegations in an effort to state a monopolization claim under the Sherman Act (which is the basis for its state law claim as well). The whole is no greater than the sum of the parts, and the amalgam does not add up to a monopolization claim. *First*, Plaintiffs fail to allege a properly defined relevant market; if anything, their allegations undermine the boundaries of the "online display advertising services" market they attempt to draw. *Infra* Part I.A. *Second*, Plaintiffs fail to plead antitrust standing: the CAC does not identify what "online display advertising services," if any, they bought, or how Defendants' alleged monopolization of that alleged market caused them antitrust injury. *Infra* Part I.B. *Third*, even if Plaintiffs had pled themselves past either of those two thresholds, they fail to plead actionable anticompetitive conduct; behind the labels of "leveraging," "tying," "dominance," and "supremacy," Plaintiffs fail to identify conduct that is actionable under the antitrust laws. *Infra* Part I.C.

Plaintiffs' California Unfair Competition Law ("UCL") claim fares no better; it relies on the exact same allegations as their Sherman Act claim, and fails on the same grounds. *Infra* Part II.

Finally, even had Plaintiffs adequately pled any claims, four of them are bound to arbitrate, and so their claims should be dismissed. *Infra* Part III.

### BACKGROUND

Plaintiffs Surefreight Global LLC, Hanson Law Firm, PC, Michael Devaney, Michael Stellman, and Vitor Lindo ("Plaintiffs") allege they "paid Google directly for the placement of digital advertisements" on unidentified websites. CAC ¶¶ 7–12.[1] Online digital advertising is

---

[1]     Another plaintiff, Grand Atlas LLC, voluntarily dismissed its claims from the CAC, and then refiled the identical lawsuit in the United States District Court for the District of Columbia, noting that its case was related to the present action. *See Grand Atlas LLC v. Google LLC, et al.*, No. 20-cv-

- 1 -

defined by Plaintiffs as "the promotion of products and services via the internet through search engines, websites, social media, and other platforms that can be accessed online." *Id.* ¶ 17.  Plaintiffs further allege that "two overarching markets in digital advertising are search advertising and display advertising." *Id.* ¶ 19.  Plaintiffs' claims, however, pertain only to display advertising (not search advertising), as they seek to represent a putative class of persons and entities that used Google's "display advertising services" to place online display advertisements.  *Id.* ¶ 146.

Importantly, Plaintiffs do not allege that Google has monopolized a market for "display advertising"; rather, they attempt to allege as the relevant market "online display advertising *services*, encompassing the overall system or process that connects online advertisers and publishers (including Google)." *Id.* ¶ 117.[2]  Plaintiffs themselves are advertisers, though they do not specify which form of advertising they bought, when they did so, or in what amounts.  None of the Plaintiffs is alleged to be an online *publisher* that sells online ad inventory space to advertisers; Plaintiffs nonetheless seek to represent a class that "includes [both] advertisers *and publishers* within the United States who used Google's display advertising services since 2016." *Id.* ¶ 118.

Recognizing that much of the advertising on the internet is sold through parties that do not employ Google's advertising services (or any other third party services at all), Plaintiffs seek to narrow the "display advertising" at issue in this case to that which is sold "*on the open web*," *id.* ¶ 122, an undefined term that nevertheless apparently excludes "companies like Facebook, Twitter, and Snapchat[, which] primarily host social media content," and also excludes Amazon, which "primarily operates an online market for goods," *id.* ¶ 129.  "These web businesses" are different,

_____

03057, ECF No. 1 (D.D.C. Oct. 22, 2020).  After the case was assigned to Judge Trevor McFadden, Grand Atlas filed a second notice of related action, inaccurately alleging the action was related to the antitrust case filed by the United States and eleven States against Google.  *Id.*, ECF No. 4.  Defendants advised Plaintiffs that they would move to transfer Grand Atlas's case back to this District based on binding terms of service specifying Santa Clara County as the forum for litigation.  Plaintiffs' counsel then dismissed that new case on November 6, 2020.  *Id.*, ECF No. 7.

[2]   In this memorandum, all emphases are supplied, and citations omit internal case references.

- 2 -

Plaintiffs say, because they "are suppliers of their own ad inventory only and have close-ended, in-house display advertising systems that they use to publish advertisements on their own sites." *Id.*  Plaintiffs also acknowledge, but carve out of their relevant market without justification, the option available to advertisers and publishers to "connect directly . . . to negotiate the placement of advertisements onto the publisher's supply of advertising space[.]" *Id.* ¶ 123.  And finally, Plaintiffs ignore the vast array of other forms of advertising available to Plaintiffs, including television and print media advertising, in concocting their relevant market.

Having drawn a market that excludes these other obvious alternatives that are available to both advertisers like Plaintiffs and to online publishers to buy and sell advertising, Plaintiffs further allege that "[t]he display advertising services market comprises advertising services and platforms, and publishing services and platforms." *Id.* ¶ 120.  Plaintiffs identify four such "intermediary services": advertiser ad servers ("AAS"), demand side platforms ("DSP"), publisher ad servers ("PAS"), and supply side platforms ("SSP").  *Id.* ¶¶ 2, 44.  Advertisers use AAS "to store ads, deliver them to publishers, and record transactions," and DSPs "to purchase digital advertising by bidding in auctions and to manage their bids." *Id.* ¶ 43.  Publishers, by contrast, use PAS "to accept, store, and manage ads; choose where and when ads appear; and track the effectiveness of ad campaigns," and SSPs "to run auctions, interface directly with their demand side equivalents, and optimize available inventory." *Id.* ¶ 42.

Plaintiffs do not plead that they themselves purchased any of these particular services from Google.  Instead, they allege that Google's alleged monopolization over the "services" market has permitted Google to "raise its prices above the competitive level to advertisers" and "pay lower than competitive prices to publishers." *Id.* ¶ 131.

Plaintiffs allege that Google wrongfully acquired and unlawfully maintained monopoly power in their manufactured relevant market in violation of Section 2 of the Sherman Act.  In particular, Plaintiffs claim that Defendants' anticompetitive conduct consisted of "leveraging its monopoly power in the online search and other markets to coerce the purchase and use of its display advertising services (an unlawful tying arrangement), acquiring rivals, denying interoperability on

several technological fronts, restricting competing firms' access to information, and rigging auctions that it controlled to its own advantage." *Id.* ¶ 158.  This same alleged conduct forms the basis for their second cause of action brought under California's Unfair Competition Law.  *Id.* ¶ 164.

*     *     *

Four of the five Plaintiffs agreed to Google Terms of Service providing for arbitration of disputes that "arise out of or relate in any way to" Google's advertising programs and services.  Kreins Decl. ¶¶ 5, 10, 13–16; Exs. A & D, § 13(A).  Defendants have been unable to confirm as much for Plaintiff Hanson Law Firm.  Kreins Decl. ¶ 17.  Plaintiffs allege no facts to suggest that the mandatory arbitration requirements of these contracts are unenforceable.

**LEGAL STANDARD**

"A claim is facially plausible when it allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 2020 WL 3969064, at *2 (N.D. Cal. July 8, 2020).  On a Rule 12(b)(6) motion to dismiss for failure to state a claim, "the Court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff," but need not accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Id.*

**ARGUMENT**

**I.   PLAINTIFFS FAIL TO ADEQUATELY PLEAD A SHERMAN ACT CLAIM.**

"To plausibly plead a monopolization claim, plaintiffs must allege: (a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury." *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1159 (9th Cir. 2019).  Plaintiff fails to plausibly allege any of the three required elements; each of these deficiencies independently requires dismissal of Plaintiffs' Sherman Act claim.

**A.   Plaintiffs Fail To Allege a Plausible "Relevant Market."**

Plaintiffs' Sherman Act claim should be dismissed because Plaintiffs' definition of a "market for online display advertising services," for purposes only of "display advertising on the open web," CAC ¶¶ 117, 122, is "facially unsustainable." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th

- 4 -

Cir. 2018).  "For antitrust purposes, a 'market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered.'"  *Paladin Assocs. v. Mont. Power Co.,* 328 F.3d 1145, 1163 (9th Cir. 2003).  A relevant market definition may not encompass[] products that are not "reasonably interchangeable by consumers for the *same purposes.*"  *Golden Gate Pharm. Servs. v. Pfizer, Inc.*, 433 F. App'x 598, 598–99 (9th Cir. 2011) (emphasis in original).  Nor can it rest on a definition that is too narrow, failing to encompass "the product at issue as well as all economic substitutes for the product."  *Hicks*, 897 F.3d at 1120.

Plaintiffs' relevant market definition runs afoul of both principles.

> **1.    Plaintiffs Have Not Adequately Alleged Facts To Support a Relevant Market Comprising a Collection of Products and Services Used by Different Customers for Different Purposes.**

Plaintiffs describe a single market that according to the CAC is comprised of four different services and/or products: "publisher ad servers, supply side platforms, demand side platforms, and advertiser ad servers," which they abbreviate as PAS, SSP, DSP, and AAS.  CAC ¶¶ 117, 120.  According to Plaintiffs, two of the services (DSP and AAS) are used only by advertisers, whereas two of them are used only by publishers (PAS and SSP).  *Id.* ¶¶ 42–43.  Indeed, with respect to each of these pairings, Plaintiffs allege that the services are "distinct" from one another.  *Id.* ¶ 52.

In light of these allegations, Plaintiffs fail to adequately plead a single relevant product market—because their purported market includes products and services that Plaintiffs and other advertisers admittedly do not purchase or use.  Accordingly, for the same reasons that Plaintiffs do not have standing to bring claims on behalf of publishers, *see infra* Part I.B, Plaintiffs have not adequately pled the contours of a display advertising services market.[3]

---

[3]    Although business practices impacting the products and services offered to *publishers* surely could have important consequences for *advertisers*, that does not render those products and services as part of a relevant antitrust market that also includes products and services directly purchased by advertisers for different purposes.

2.     The "Online Display Advertising Services" Market Is Facially
Unsustainable for Excluding Economic Substitutes.

The alleged "online display advertising services" market is also facially unsustainable

because it excludes several "*economic substitutes* for the product." *Hicks*, 897 F.3d at

1120. "Including economic substitutes ensures that the relevant product market encompasses 'the

group or groups of sellers or producers who have actual or potential ability to deprive each other of

significant levels of business.'" *Id.* at 1120. Here, Plaintiffs' proposed market for "online display

advertising services" on the "open web" improperly excludes other ways for advertisers to reach

website publishers without using Google's products and services, and also improperly excludes the

many alternatives to online display advertising.

a.     The Proposed Relevant Market Excludes Alternative Means of
Accessing Online Display Advertising.

Plaintiffs' proposed relevant market excludes alternative means to access online display

advertising, *i.e.*, means other than the display advertising services offered by Google. As such, it

fails to delineate an appropriate antitrust relevant market.

As an initial matter, the CAC provides no basis to exclude from the relevant market direct

placement of online display advertisements through negotiation between advertisers and

publishers—skipping over the role of any "intermediary in the sale of ad space on third-party

websites to advertisers," CAC ¶ 30, whether that role is played by Google or some other party. *See,*

*e.g.*, *Payment Logistics Ltd. v. Lighthouse Network, LLC*, 2018 WL 5311907, at *3 (S.D. Cal. Oct.

24, 2018) (dismissing claims founded on purported relevant market limited to the market for

payment interfaces and which "exclud[ed] POS systems that connect directly to MAS systems"

without using the intermediary). To the contrary, the CAC concedes that "an advertiser may connect

directly with a publisher to negotiate the placement of advertisements onto the publisher's supply of

advertising space," CAC ¶ 123; it simply proclaims that direct route "impractical," *id.*, without any

detail or explanation.

In addition, the CAC neglects to explain why a properly defined relevant market does not

include the many significant publishers that employ their own in-house products and services to

display advertisements on their own websites, rather than using third party products and services like those offered by Google.  The CAC concedes that that is how digital advertisements are placed on the platforms of some of the largest and most popular websites in the world—Facebook, Twitter, Snapchat, and Amazon—each of which requires use of their own "in-house display advertising systems," and not Google's.  *Id.* ¶ 129.  Plaintiffs fail to plausibly allege that using the advertising services of these companies in order to advertise on their websites is not reasonably interchangeable with using Google's display advertising services to place advertising on other websites.  Simply put, nowhere in the CAC do Plaintiffs allege that digital display ads placed on Facebook or Amazon are not substitutes for digital display ads placed on other properties on the "open web," or that the advertisers like Plaintiffs seeking to place digital display ads on Facebook and Amazon could not use the in-house tools offered by these companies to do so.  Plaintiffs' effort to carve out popular websites from the relevant market simply confirms that their market definition is out of step with reality.

The reason that Plaintiffs single out these other channels of display advertising is that if they are included within the alleged relevant market, Plaintiffs have no hope of pleading that Google has monopoly power in "online display advertising services."  But that is no reason to lower the pleading standard.  Gerrymandering such advertising out of the relevant market does not address the interchangeability of that option for market participants.

> **b.**    **The Proposed Market Excludes Alternative Forms of Advertising.**

Advertising is not a new phenomenon and exists in numerous different forms.  As Plaintiffs acknowledge, "[b]usinesses have long relied on advertising to promote their products, generate brand awareness, and increase sales," CAC ¶ 16; and the internet is only one way to advertise, as businesses also can promote their products through "print, television, radio, or billboard advertisements."  *Id.* ¶ 124.

Plaintiffs' restriction of the relevant market to a single form of advertising runs counter to the Ninth Circuit's decision in *Hicks*.  In *Hicks*, the Ninth Circuit rejected a proposed relevant market of advertising between commercial breaks during professional golf tournaments, because it excluded

1   numerous "economic substitutes," including both digital advertising ("advertising through a search

2   engine or social media platform that provides advertisers insights on users' online history"), as well

3   as non-digital advertising ("airing commercials during golf-related television programs, radio

4   broadcasts, or podcasts," or "put[ting] its logo on a magazine ad, or on a wall in golf course

5   clubhouses, or any number of other places").  897 F.3d at 1121.  *Hicks* cited with approval the "many

6   courts [that] have rejected antitrust claims reliant on proposed advertising markets limited to a single

7   form of advertising."  *Id.* at 1123 (citing *Am. Online, Inc. v. GreatDeals.Net*, 49 F. Supp. 2d 851, 858

8   (E.D. Va. 1999) (rejecting a relevant market of "email advertising" for excluding substitutes,

9   including "the World Wide Web, direct mail, billboards, television, newspapers, radio, and leaflet, to

10  name a few"); *Huron Valley Publ'g Co. v. Booth Newspapers, Inc*., 336 F. Supp. 659, 662 (E.D.

11  Mich. 1972) (rejecting a relevant market of "newspaper advertising" for excluding other "modes of

12  retail advertising")); *see also Reveal Chat*, 2020 WL 3969064, at *11 (expressing "real concerns"

13  over a "Social Advertising Market").

14          Far from undermining the rationale of these decisions, the CAC concedes the

15  interchangeability between online advertising and other forms of advertising, affirmatively alleging

16  that newspaper ad revenue decreased at the same time that Google's ad revenue from online

17  advertising increased.  CAC ¶ 100.  That is irreconcilable as a matter of law with any suggestion that

18  the products each constitute a separate market unto themselves.

19          Plaintiffs' only effort to distinguish "online display advertising" from what they call

20  "traditional forms of advertising" is that the former allegedly "reaches a distinct group of potential

21  customers" and that it "can be continuously updated and improved based on data showing how

22  consumers are responding."  *Id.* ¶ 124.  The first factor is irrelevant in the absence of any

23  "explanation why this group of [potential consumers] *is distinct for advertising purposes* from the

24  typical group of [consumers]."  *Hicks*, 897 F.3d at 1122.  The second factor, at most, suggests that

25  online display advertising is more effective, which again "would not place [an] advertising format in

26  a distinct market" when "companies can reach [target] consumers through other formats."  *Id.*  The

27  Ninth Circuit explained in *Hicks* that despite alleged differences in target consumers and

28

- 8 -

1    effectiveness, advertisers can target golf fans in myriad ways other than endorsements or live action

2    advertising.  *Id.* at 1121.  The CAC provides no basis to analyze the relevant market here any

3    differently.

4            **B.     Plaintiffs Fail To Plead Antitrust Standing.**

5            Plaintiffs fail to plead sufficient facts to state a plausible antitrust injury.  Antitrust injury

6    requires "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which

7    makes the conduct unlawful, . . . (4) that is of the type the antitrust laws were intended to prevent,'

8    and (5) 'the injured party [is] a participant in the same market as the alleged malefactors."  *Reveal*

9    *Chat*, 2020 WL 3969064, at *9.  "Naked assertions" of antitrust injury that are "devoid of further

10   factual enhancement" are insufficient to meet Plaintiffs' burden at the pleading stage.  *Id.*  The CAC

11   is plainly deficient in plausibly alleging antitrust injury.

12           *First,* as a threshold matter, Plaintiffs plead nothing to suggest that they are participants in the

13   "online display advertising services" market and thus "suffered [their] injury in the market where

14   competition is being restrained."  *Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d

15   696, 705 (9th Cir. 2001).  "[T]he party alleging the injury must be either a consumer of the alleged

16   violator's goods or services or a competitor of the alleged violator in the restrained market."  *Somers*

17   *v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013).  Where, as here, a plaintiff does not plead "specific

18   facts detailing their alleged purchases, it is impossible to tell whether the Complaint plausibly alleges

19   that they *are* market participants," which itself compels dismissal.  *Sahagian v. Genera Corp.*, 2009

20   WL 9504039, at *5 (C.D. Cal. July 6, 2009); *see also, e.g.*, *Reveal Chat*, 2020 WL 3969094, at *9

21   (dismissing for lack of allegations that "Plaintiffs participate in" the purported relevant market).

22           Here, the CAC pleads nothing more than that the five plaintiffs "paid Google directly for the

23   placement of digital advertisements during the class period."  CAC ¶¶ 8–12.  There are not even any

24   allegations as to whether the alleged "digital advertisements" included *display* advertising, much less

25   on what websites, at what points in time, or at what prices.  Nor is there any allegation whether

26   Plaintiffs' display advertising expenditures, if any, relate to purchases of Google's display

27   advertising *services*, as opposed to the purchase of Google's display advertising *inventory* on

28

Google's websites.  *See id.* ¶ 126 (alleging that "the market for display advertising services is separate and distinct from the market for advertisement inventory").  And to be sure, Plaintiffs could not possibly have purchased services that their CAC pleads are relevant only to publishers, *i.e.*, as to the PAS and SSP "segments" of the purported relevant market.  *See id.* ¶ 43.  Plaintiffs provide no factual basis for any claims relating to the use of PAS or SSP, nor could they possibly represent a class including such purchasers.

     *Second*, the only form of purported advertiser injury identified by the CAC is that "advertisers have paid more than they otherwise would have paid."  *Id.* ¶ 134.  This is conclusory in the extreme, but more to the point, Plaintiffs do not plead any facts to suggest that they themselves overpaid for display advertising *services*—on what website, on what date, for what purpose, and for what amount—as a result of Google's alleged monopolization of any relevant market.  And more broadly, the CAC contains nothing beyond groundless speculation of what advertisers generally "would have paid," and is devoid of any allegation that Google raised advertising *services* prices or increased its "take rate" at any point in time.[4]  *See Aya Healthcare Servs. v. AMN Healthcare, Inc.*, 2017 WL 6059145, at *5 (S.D. Cal. Dec. 6, 2017) ("Plaintiffs repeatedly claim Defendants' alleged conduct resulted in higher prices and reduced output.  However, Plaintiffs do not allege facts or anecdotal evidence supporting this contention.").

     *Third*, Plaintiffs also do not plausibly allege any injury "flow[ing] from that which makes the conduct unlawful."  *Reveal Chat*, 2020 WL 3969064, at *9.  While the CAC recites various allegations as to various advertising policies or procedures, the only such conduct that is specifically alleged to have "cause[d] advertisers to pay higher prices" pertains to Google's alleged "reserve-price practices."  CAC ¶ 79.  But Plaintiffs do not allege that Google set the reserve price other than

---

4     Plaintiffs allege that "[a]s of 2018, the average digital advertisement sold for 12% more than it did in 2016, a price increase five times the rate of inflation."  CAC ¶ 77.  Plaintiffs however do not allege whether the increase is attributable to the price of *digital* advertisement *inventory*, or to the price of digital advertisement *services* (or, more narrowly, *Google's* digital advertisement services, much less its *display* advertising services).  This allegation just begs the relevant question.

- 10 -

1      in the context of "search advertising," *id.* ¶ 36, which is not even within the relevant market at issue

2      here under Plaintiffs' definition, *see id.* ¶ 125.  In particular, Plaintiffs have not alleged any reserve

3      prices set in display advertising auctions in which they participated or which were managed by

4      Defendants' alleged advertising "services."

5              For these reasons, Plaintiffs have failed to plausibly allege antitrust standing.

6      **C.      Plaintiffs Fail To Plead Actionable Anticompetitive Conduct.**

7              In order to satisfy its burden to plead "the willful acquisition or maintenance of monopoly

8      power," Plaintiffs must plead facts sufficient to show that Google engaged in anticompetitive acts,

9      because the "mere possession of monopoly power will not be found unlawful unless it is

10     accompanied by an element of anticompetitive conduct."  *PNY Techs. v. SanDisk Corp.*, 2012 WL

11     1380271, at *10 (N.D. Cal. Apr. 20, 2012).

12             Plaintiffs fail to meet their burden.  The CAC loosely refers to various alleged conduct

13     stretching across different business units, over a period of many years, including conduct wholly

14     unrelated to any product that Plaintiffs conceivably could have used.  Ultimately, to plead their

15     single count of Sherman Act monopolization, Plaintiffs refer to monopoly leveraging, the acquisition

16     of rivals, denial of interoperability, restricting competitors' access to information, and "rigging

17     auctions."  CAC ¶ 158.  None of these allegations adequately pleads a Section 2 claim.  Nor do

18     Plaintiffs' allegations related to government investigations, *id.* ¶¶ 101–13, which "carr[y] no weight

19     in pleading an antitrust . . . claim."  *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d

20     1011, 1024 (N.D. Cal. 2007); *see also In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133,

21     1149 n.11 (N.D. Cal. 2009).

22     **1.      Plaintiffs Fail To Plead A Claim for "Monopoly Leveraging."**

23             Plaintiffs allege that Google "leverage[es] its monopoly power in the online search and other

24     markets to coerce the purchase and use of its display advertising services."  CAC ¶ 158.  According

25     to Plaintiffs, "to gain access to the search data over which Google has monopoly control, an

26     advertiser must agree to use Google's products in the separate display advertising services

27     market."  *Id.* ¶ 68 (emphasis omitted); *see also id.* ¶¶ 54, 58–62 (similar allegations as to other

28

- 11 -

consumer data Google has access to).  Plaintiffs, who have pled no detail about the advertisements or advertising services they allegedly bought, do not claim to have encountered such "leveraging" themselves.  In any event, they state no such claim.

### a.   Plaintiffs' Leveraging Allegations Are Legally Insufficient.

Even if Plaintiffs had properly pled that Defendants had monopoly power in a properly defined relevant antitrust market (and they have not), the Ninth Circuit has "reject[ed] monopoly leveraging as an independent theory of liability under Section 2," and made clear that the "anticompetitive dangers that implicate the Sherman Act are not present when a monopolist has a lawful monopoly in one market and uses its power to gain a competitive advantage in the second market."  *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 547, 548 (9th Cir. 1991).  Plaintiffs, therefore, cannot sustain a claim of monopoly leveraging absent "some other exclusionary practice" "in the monopoly market or below-cost pricing in the second market."  *John Doe I v. Abbott Labs.*, 571 F.3d 930, 931 (9th Cir. 2009); *see also Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 n.4 (2004) ("[L]everaging presupposes anticompetitive conduct.").  Plaintiffs have not even alleged the boundaries of a relevant market for "online search," much less pled an "exclusionary practice" therein; and they do not plead below-cost pricing in the "online display advertising services" market.

Plaintiffs also fail to allege why an advertiser who wishes to use Google for *search* advertising is coerced into also using Google for *display* advertising.  Plaintiffs' allegations suggest at most that Google's display advertising products are more effective and attractive to advertisers because Google allegedly benefits from the data obtained from Google search advertising.  In particular, Plaintiffs allege that as a result of Google's alleged "data-gathering supremacy, Google is better able to demonstrate the effectiveness of using its advertising platforms," and to convince advertisers that such data will help them "craft more effective advertising campaigns."  CAC ¶¶ 58, 68.  But the Sherman Act does not condemn "supremacy" or "effectiveness"—more typically descriptive of competition on the merits and procompetitive outcomes.  These allegations come nowhere near pleading exclusionary conduct in the undefined market for "online search."

**b.** **Plaintiffs Have Failed To Adequately Plead a Tying Claim.**

Plaintiffs' monopoly leveraging allegation makes parenthetical reference to an alleged "unlawful tying arrangement."  CAC ¶ 158.  None of the "tying arrangements" referenced in passing in the body of the CAC fit that bill.  Plaintiffs first allege that Google's "product mergers" resemble "an unlawful tying arrangement."  *Id.* ¶ 52.  Plaintiffs also allege that Google requires "Google services be used to place ads on YouTube," a Google property.  *Id.* ¶ 73.

To sustain a tying claim in the Ninth Circuit, a plaintiff must first plead "that there exist two distinct products or services in different markets whose sales are tied together."  *Paladin Assocs.*, 328 F.3d at 1159.  To satisfy the first prong, a plaintiff "must define the relevant market for both the tying product and the tied product."  *Packaging Sys. v. PRC-Desoto Int'l*, 268 F. Supp. 3d 1071, 1083 (C.D. Cal. 2017); *see also Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1174 (N.D. Cal. 2013) (dismissing tying claims for lack of plausible market definitions).  *Second*, a plaintiff must show "that the seller possesses appreciable economic power in the tying product market sufficient to *coerce* acceptance of the tied product."  *Paladin Assocs.*, 328 F.3d at 1159.  It is "[e]ssential to th[is] second element of a tying claim . . . that the seller *coerced* a buyer to purchase the tied product.  A plaintiff must present evidence that the defendant *went beyond persuasion* and coerced or forced its customer to buy the tied product in order to obtain the tying product."  *Id.*  *Third*, a plaintiff must show "that the tying arrangement affects a not insubstantial volume of commerce in the tied market."  *Id.*  This requires a plaintiff to "plead facts showing [a] negative impact on competition in the tied markets."  *Sidibe*, 4 F. Supp. 3d at 1178.

Plaintiffs' claim that Google merged different products together, and so unlawfully tied them together, does not survive such scrutiny.  In particular, Plaintiffs claim that Google "merg[ed] its PAS with its SSP," and "merg[ed] its AAS with its DSP."  CAC ¶ 52.  Plaintiffs allege that this constituted a "bundl[ing] [of] two distinct products together and rebrand[ing] the integrated entity as a single product."  *Id.*  What Plaintiffs do *not* allege is that Google actually coerces usage of the respective pairs of products together: they do not plead that either product was unavailable for purchase without the other.  *See Apple iPod iTunes Antitrust Litig.*, 2009 WL 10678940, at *5 (N.D.

- 13 -

1    Cal. Oct. 30, 2009) (requiring coercion).  To the contrary, Plaintiffs elsewhere concede that these

2    products remain available separately.  *See*, *e.g.*, CAC ¶ 85 (acknowledging that "Google's SSP can

3    accept bids from non-Google advertising services").  Further, even had Plaintiffs pled coercion in

4    such rebranding efforts, they have not properly defined any of PAS, SSP, AAS, or DSP as relevant

5    markets—to the contrary, they claim that together they all comprise one relevant product.  *See supra*

6    Part I.A.1; *Catch Curve, Inc. v. Venali, Inc.*, 519 F. Supp. 2d 1028, 1039 (C.D. Cal. 2007)

7    (dismissing tying claim for lack of "details to support [the] market definition").

8            With respect to Plaintiffs' YouTube-related allegations, Plaintiffs have failed to plead a

9    relevant market for the tying and tied products.  *First*, for the reasons described above, Plaintiffs

10   have failed to plausibly define the allegedly tied market for "display advertising services."  *Supra*

11   Part I.A.  Plaintiffs have also failed to plead a relevant market for the tying product; they make

12   reference to a "video-ad publishing market," CAC ¶ 71, but do not otherwise plead facts to support

13   such a market.  *See Catch Curve*, 519 F. Supp. 2d at 1039.  *Second*, the CAC does not allege that

14   Google possesses enough economic power in a so-called "video-ad publishing market" to force

15   advertisers to purchase a tied product.  Instead, Plaintiffs allege only that "[a]bout half of all video

16   display ads *not appearing on Facebook and Amazon* appear on YouTube."  CAC ¶ 71.  The CAC,

17   devoid of any allegations regarding makeup of any such market as a whole—or an explanation of

18   why video display ads on Facebook and Amazon are summarily excluded therefrom—makes it

19   impossible to evaluate whether Google (through YouTube) has enough economic power in the

20   "video-ad publishing market" to force advertisers to buy Google advertising services in order to

21   advertise on YouTube.  *See, e.g.*, *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1031–32 (N.D. Cal.

22   2015) (denying tying claim when plaintiff only alleged that Android OS occupies a 51.7% share of

23   the U.S. *smartphone* market, which excluded other handheld devices such as phones and tablets).

24           *Third*, and in any event, Plaintiffs' YouTube-related allegations are time-barred, as the

25   specific conduct challenged occurred more than four years ago.  *See* CAC ¶ 71 ("in 2015, Google

26   took YouTube off the digital ad exchanges"); 15 U.S.C. § 15(b) (barring actions "unless commenced

27   within four years after the cause of action accrued"); *cf. infra* Part I.C.4.

28

- 14 -

1

2.       **Plaintiffs Fail To Plead a Denial of Interoperability Claim.**

2

3            While other competitors allegedly believed that "it was most efficient to interoperate with

4    competitors," CAC ¶ 45, Plaintiffs allege that Google has failed to make its technologies sufficiently

5    interoperable with those offered by its competitors.  *See id.* ¶¶ 82–90.  Chiefly, Plaintiffs allege that

6    (1) Google's SSP "is designed to operate more efficiently with Google's own advertising service,"

7    *id.* ¶¶ 83–86; and that (2) Google's "systems" do not work with the header bidding mechanism

8    "designed by Google's competitors," *id.* ¶¶ 87–90.  Even were these allegations moored in any way

9    to whatever advertising or advertising services Plaintiffs themselves purchased, the allegations state

10   no claim.

11           The Sherman Act imposes "no duty to aid competitors."  *Trinko*, 540 U.S. at 411;  *see also*

12   *FTC v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020) ("[A]s we recently put it, in a bit more

13   colorful terms: 'Competitors are not required to engage in a lovefest.'").  Antitrust law therefore does

14   not require Google to make its services interoperable—much less as "efficiently" so—with its

15   competitors' services.  "[M]erely introducing a product that is not technologically interoperable with

16   competing products is not violative of Section 2."  *Facebook, Inc. v. Power Ventures, Inc.*, 2010 WL

17   3291750, at *13 (N.D. Cal. July 20, 2010).  The Ninth Circuit has repeatedly reaffirmed as

18   much.  For example, in *LiveUniverse v. MySpace, Inc.*, it held that MySpace's redesign of its

19   platform to prevent users to link to another website stated no claim because MySpace has the right

20   "freely to exercise [its] own independent discretion as to parties with whom [it] will deal."  304 F.

21   App'x 554, 556–57 (9th Cir. 2008); *see also Allied Orthopedic Appliances v. Tyco Health Care Grp.*,

22   592 F.3d 991, 1002 (9th Cir. 2010) ("Plaintiffs' argument that Tyco could have made its monitors

23   compatible with the old sensors also fails.  Our precedents make clear that a monopolist has no duty

24   to help its competitors survive or expand when introducing an improved product design.").  Google

25   is under no duty to aid its competitors by ensuring that its products are interoperable with its

26   competitors' products.

27           The lack of such a duty is for a good reason.  "In a competitive market, firms routinely

28   innovate in the hope of appealing to consumers, sometimes in the process making their products

- 15 -

incompatible with those of rivals; the imposition of liability when a monopolist does the same thing will inevitably deter a certain amount of innovation." *United States v. Microsoft Corp.*, 253 F.3d 34, 65 (D.C. Cir. 2001) (en banc) (per curiam).  "Antitrust scholars have long recognized the undesirability of having courts oversee product design, and any dampening of technological innovation would be at cross-purposes with antitrust laws." *Allied Orthopedic*, 592 F.3d at 1000.  Such undesirability is evident on the face of the CAC.  For example, Plaintiffs allege that Google's Accelerated Mobile Pages ("AMP") technology is incompatible with header bidding, which publishers can enable by placing on their websites certain javascript code.  CAC ¶¶ 87, 89.  But Plaintiffs concede that "[b]y limiting the type of programming codes that can be used on a page, AMP pages load faster than they otherwise would," *id.* ¶ 97—a critical feature of digital advertising.  Similarly, Plaintiffs also concede that the design of Google's SSP is such that it "operate[s] more efficiently with Google's own advertising services."  *Id.* ¶ 85.  This effort at "product improvement by itself does not violate Section 2."  *Allied Orthopedic*, 592 F.3d at 999.

### 3. Plaintiffs Fail To Plead a Claim Based on the Alleged Failure To Disclose Various Data and Information to Competitors.

Plaintiffs contend that Google has engaged in anticompetitive conduct by "failing to disclose key market information to publishers, advertisers, and potential competitors."  CAC ¶ 91.  Specifically, Plaintiffs take issue with Google's failure to publish certain metrics from its advertising services, including its "take rate," costs and fees, "time-stamp information on bids," and data concerning the effectiveness of digital ads.  *Id.* ¶¶ 93, 95.  Moreover, Plaintiffs challenge alleged actions that "make it harder for its competitors" to obtain Google's consumer data.  *Id.* ¶ 96.  Factual deficiencies aside, these allegations fail to identify any conduct deemed anticompetitive under the antitrust laws.  Allegations concerning Google's failure to disclose data or information should be dismissed.

In order to allege anticompetitive conduct tethered to Google's failure to provide certain information, Plaintiffs must allege that Google was under some duty to provide that information.  *See Reveal Chat*, 2020 WL 3969064, at *13.  Generally, there is "no duty to aid competitor[s]."  *Id.*; *see*

*supra* Part I.C.2.  Because Plaintiffs have made no allegations to circumvent that general rule here, any allegations concerning Google's failure to provide information to its competitors must be dismissed.  *See Reveal Chat*, 2020 WL 3969064, at *13 (dismissing antitrust claims challenging Facebook's refusal to provide consumer data to its competitors because Facebook had no duty to deal).

Plaintiffs' information-sharing allegations do not remotely describe a circumstance in which "[t]he court can simply order the defendant to deal with its competitors on the same terms that it already deals with others in the existing retail market, without setting the terms of dealing."  *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1133 (9th Cir. 2004).  Courts are particularly hesitant to force competitors to share information with one another—particularly where, as here, the information is not "ma[d]e available to the public"—for "an antitrust court is unlikely to be an effective day-to-day enforcer of these detailed sharing obligations."  *Id.*

Finally, to the extent that Plaintiffs claim that Google was under a duty to share the challenged information with its customers, rather than its competitors, *see* CAC ¶ 91 (claiming Google failed to share information with "publishers" and "advertisers," both of whom constitute services customers), the allegations fail for the independent reason that they fail to plead harm to competition.  Whatever "failures of transparency" allegedly "prevent advertisers from knowing if they are wasting some of their spend," *id.* ¶ 95, that is not a harm that the antitrust laws exist to prevent.  While Plaintiffs may prefer to get that information, it has nothing to do with competition.

### 4. Plaintiffs Fail To Plead an Antitrust Claim Based on Google's Acquisitions.

Plaintiffs allege that "Google's acquisitions . . . have enabled Google to exclude competition through a variety of anticompetitive policies and activities."  CAC ¶ 46.  Specifically, Plaintiffs allege that Google made "nine key acquisitions" between 2007 and 2014, though they name only five of them.  *Id.* ¶ 47.  Plaintiffs have not pled sufficient factual support for the claim that Google's acquisitions violated Section 2.  In any event, because none of the acquisitions took place within the applicable statute of limitations, Plaintiffs' claim based on Google's acquisitions is out of time.

1      Although Plaintiffs identify five acquisitions by name, the CAC makes specific allegations

2   regarding only one of them: the 2007 acquisition of DoubleClick that was reviewed at the time by

3   the Federal Trade Commission, which closed its investigation without taking any action to block the

4   merger.  Plaintiffs allege that DoubleClick "was for many years the only way to obtain full access to

5   Google's AdX exchange."  *Id.* ¶ 83.  Plaintiffs further allege that in 2018, Google "merged

6   DoubleClick for Publishers and AdX into a single product called Google Ad Manager, making it

7   plain to the industry that they are indeed linked."  *Id*.  This is at most a rehashing of Plaintiffs'

8   allegation that offering to sell two products together is an "unlawful tying arrangement," which states

9   no claim.  *See supra* Part I.C.1.b.  The CAC alleges nothing else anticompetitive about the

10   acquisition of DoubleClick, and they allege nothing else about the other four identified acquisitions.

11      Plaintiffs thus fail to sufficiently "demonstrate how" any of "the acquisitions unreasonably

12   restricted competition."  *Eastman v. Quest Diagnostics Inc.*, 724 F. App'x 556, 559 (9th Cir.

13   2018).  Plaintiffs do not allege by how much each acquisition increased Google's share of any

14   relevant market; nor do they make any "allegations related to the remaining competitors in the

15   relevant market[s]."  *Id*.  Plaintiffs' allegations are therefore "insufficient to establish that the merger

16   led to a greater power to exclude competitors."  *Carefusion Corp. v. Medtronic, Inc.*, 2010 WL

17   4509821, at *8 (N.D. Cal. Nov. 1, 2010).  The CAC's failure in this regard is unsurprising, insofar as

18   "vertical integration . . . is usually pro-competitive."  *Smilecare Dental Grp. v. Delta Dental Plan of*

19   *Cal.*, 858 F. Supp. 1035, 1040 n.7 (C.D. Cal. 1994).

20      Even had Plaintiffs articulated a claim as to any of the five identified acquisitions, the latest

21   acquisition occurred in 2014, and so Plaintiffs are far out of time.  *See* 15 U.S.C. § 15(b) ("Any

22   action to enforce any cause of action under section 15, 15a, or 15c of this title shall be forever barred

23   unless commenced within four years after the cause of action accrued.").  Well aware of the facial

24   untimeliness of any such claim, Plaintiffs plead purported "continuing violations" and "fraudulent

25   concealment," CAC ¶¶135–45, but Plaintiffs come nowhere near the pleading standard for either.

26      To begin with, the "continuing violation doctrine does not make sense in the context of

27   anticompetitive mergers," and therefore should not apply to challenges to acquisitions, even when

28

those challenges are brought under Section 2 of the Sherman Act. *Reveal Chat*, 2020 WL 3969064, at *7; *see also Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 599 (6th Cir. 2014) ("We have not discovered a case . . . in which the continuing violations doctrine has been applied to price increases following a merger or acquisition. Taken altogether, it is clear from the complete absence of supporting case law that the continuing violations doctrine does not apply to such claims."); *Complete Entm't Res. v. Live Nation Entm't, Inc.*, 2016 WL 3457177, at *1 (C.D. Cal. May 11, 2016) ("find[ing] this reasoning" from *Z Techs.* "persuasive" and dismissing antitrust claim).

In any event, Plaintiffs would need to allege that Google "completed an overt act during the limitations period that" was "a new and independent act," which inflicted "new and accumulating injury on the plaintiff." *Reveal Chat*, 2020 WL 3969094, at *6. "Merely carrying out during the limitations period a final, binding decision made prior to the limitations period does not qualify as a new overt act." *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1071–72 (N.D. Cal. 2016); *see also Complete Entm't Res.*, 2016 WL 3457177, at *1.

Likewise, Plaintiffs have failed to plead fraudulent concealment. To do so, Plaintiffs must satisfy the heightened standard of Rule 9(b), *Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 886 (N.D. Cal. 2015), in pleading that "(1) [Google] took affirmative acts to mislead . . . [Plaintiffs]; (2) . . . [Plaintiffs] did not have actual or constructive knowledge of the facts giving rise to [their] claim; and (3) . . . [Plaintiffs] acted diligently in trying to uncover the facts giving rise to [their] claim," *Garrison*, 159 F. Supp. 3d at 1073. Here, Plaintiffs do not even get out of the box, for they do not plead a single affirmative act to mislead. *See Ryan*, 147 F. Supp. 3d at 887 ("[F]ailure to own up to illegal conduct . . . is not sufficient for fraudulent concealment."). Moreover, Plaintiffs argue that they had "no means from which they could have discovered [Google's] wrongful conduct." CAC ¶ 136. But Plaintiffs do not plead—nor could they—that they were unaware of the five relevant acquisitions, all of which were publicly announced. *See, e.g.*, *Press Release: Google to Acquire DoubleClick*, Wall Street J. (Apr. 14, 2007), https://tinyurl.com/y26pg7jd; Jason Kincaid, *Google Acquires AdMob for $750 Million*, Tech Crunch (Nov. 9, 2009), https://tinyurl.com /y5rdkngw; *Investing in Exchange Bidding*, DoubleClick Advertiser Blog (June 3, 2010),

1

https://tinyurl.com/y4pkngkc (acquisition of Invite Media); *Google Wins Antitrust Approval to Buy*

2

*AdMeld*, Reuters (Dec. 2, 2011), https://tinyurl.com/y4twktk2; Anthony Ha, *Google Acquires*

3

*Adometry To Bring More Attribution To Google Analytics*, Tech Crunch (May 6, 2014),

4

https://tinyurl.com/yxr9j99f.

5

Finally, to the extent that Plaintiffs purport to seek injunctive relief, the doctrine of laches

6

bars any such claim.  *See Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1205 (9th Cir.

7

2014) ("four-year statute of limitations . . . furnishes a guideline for computation of the laches

8

period").

9

### 5.     Plaintiffs' Conclusory Allegations as to Google "Rigging Auctions" Fail.

10

Plaintiffs allege that Google "rig[s] auctions that it controlled to its own advantage," CAC

11

¶ 158, but do not plead any facts explaining how Google rigged any advertising auctions to its own

12

advantage, much less how such conduct has harmed advertisers like Plaintiffs or competition more

13

broadly.  To the extent Plaintiffs' "rigging" claim is premised on Google's denial of interoperability

14

between its services and header bidding, as explained above, the Sherman Act imposes no duty on

15

Google to aid its competitors.  *See supra* Part I.C.2.

16

## II.     PLAINTIFFS FAIL TO PLAUSIBLY PLEAD VIOLATIONS OF THE UCL.

17

Plaintiffs' UCL claim can go no further than, and should be dismissed for the same reasons

18

as, their Sherman Act claim.  *See Feitelson*, 80 F. Supp. 3d at 1034 (citing *City of San Jose v.*

19

*Comm'r of Baseball*, 776 F.3d 686, 691–92 (9th Cir. 2015)).  Courts in this Circuit have routinely so

20

held.  *See, e.g.*, *Hicks*, 897 F.3d at 1124; *Novation Ventures, LLC v. J.G. Wentworth Co.*, 711 F.

21

App'x 402, 405 (9th Cir. 2017) ("as pled, any claimed unlawfulness [or] unfairness . . . was based

22

entirely on the alleged federal antitrust . . . wrongdoing"); *LiveUniverse, Inc.*, 304 F. App'x at 557

23

("Where, however, the same conduct is alleged to support both a plaintiff's federal antitrust claims

24

and state-law unfair competition claim, a finding that the conduct is not an antitrust violation

25

precludes a finding of unfair competition."); *Sidibe*, 4 F. Supp. 3d at 1181.

26

That Plaintiffs allege that Google acted not only unlawfully but also unfairly does not change

27

the result.  "If the same conduct is alleged to be both an antitrust violation and an 'unfair' business

28

1    act or practice for the same reason . . . the determination that the conduct is not an unreasonable

2    restraint of trade necessarily implies that the conduct is not 'unfair' towards consumers."  *Chavez v.*

3    *Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001).  That fits Plaintiffs' CAC to a tee.  *Compare*

4    CAC ¶ 158 (Sherman Act claim) *with id.* ¶ 164 (predicating unfairness claim on the exact same

5    alleged conduct).  Therefore, a determination that the CAC fails to allege a Sherman Act claim

6    "necessarily implies that the conduct is not 'unfair' towards consumers."  *Chavez*, 93 Cal. App. 4th

7    at 375.

8    ### III.    ALL PLAINTIFFS OTHER THAN HANSON ARE BOUND TO ARBITRATE.

9            Even were Plaintiffs to have stated a claim, four of them—Surefreight Global LLC and

10   Messrs. Devaney, Stellman, and Lindo—are bound to arbitrate such claims, and their claims

11   therefore should be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(1) and

12   12(b)(6).  These Plaintiffs agreed to Google's Advertising Program Terms of Service ("TOS")

13   between 2017 and 2018, and so "agree[d] to arbitrate all disputes and claims . . . that arise out of or

14   relate in any way to" Google's advertising programs.  Kreins Decl. ¶¶ 5, 10, 13–16; Exs. A & D, §

15   13(A).  Defendants request that the Court take judicial notice of the TOS and related documents, as

16   specified in, and authenticated by, the attached Declaration of Michael Kreins.  *See Trudeau v.*

17   *Google LLC*, 349 F. Supp. 3d 869, 876 (N.D. Cal. 2018) (taking judicial notice of the "TOS, the opt-

18   out website, and the website at which advertisers accepted or declined the TOS," because, *inter alia*,

19   "they are not the subject of reasonable dispute and their authenticity is not in question" (citing Fed.

20   R. Evid. 201)), *aff'd*, 816 F. App'x 68 (9th Cir. 2020).  These Plaintiffs' consent to the TOS means

21   that the Court should dismiss their claims.  *See Johnmohammadi v. Bloomingdale's, Inc.*, 755 F.3d

22   1072, 1073 (9th Cir. 2014) ("a district court may either stay the action or dismiss it outright when . . .

23   the court determines that all of the claims raised in the action are subject to arbitration").

24           "The FAA reflects a strong policy in favor of arbitration," *Trudeau*, 349 F. Supp. 3d at 874

25   (citing *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)), and "mandates that district

26   courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement

27   has been signed," *Kilgore v. KeyBank, N.A.*, 718 F.3d 1052, 1058 (9th Cir. 2013).  A court's role

28

- 21 -

1   "under the FAA is to determine (1) whether a valid agreement to arbitrate exists and, if it does, (2)

2   whether the agreement encompasses the dispute at issue." *Id*. Here, the answer to both questions is

3   yes.

4   *First*, the arbitration agreement is neither procedurally nor substantively

5   unconscionable. The "threshold inquiry in California's unconscionability analysis is whether the

6   arbitration agreement is adhesive." *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1211 (9th Cir.

7   2016). An "arbitration agreement is not adhesive if there is an opportunity to opt out of it." *Id*. This

8   Court has previously observed that Google's TOS "make[s] it clear that advertisers can freely opt out

9   of the Dispute Resolution Agreement provision." *Adtrader, Inc. v. Google LLC*, 2018 WL 1876950,

10  at *4 (N.D. Cal. Apr. 19, 2018); *see also Trudeau*, 349 F. Supp. 3d at 877 ("[T]he . . . TOS provided

11  a meaningful opportunity to opt out of the arbitration provision."). Because the agreement contains a

12  voluntary opt out procedure, "the arbitration provision is not procedurally unconscionable and thus

13  not unconscionable." *Trudeau*, 349 F. Supp. 3d at 877.

14  Because the arbitration agreement is not procedurally unconscionable, the Court need not

15  reach the issue whether the agreement is substantively unconscionable. *Id.* In any event, it is not "so

16  one-sided as to shock the conscience." *Shierkatz Rllp v. Square, Inc.*, 2015 WL 9258082, at *10

17  (N.D. Cal. Dec. 17, 2015). First, it is bilateral. *See Garcia v. Comcast Cable Commc'n Mgmt. LLC*,

18  2017 WL 1210044, at *3 (N.D. Cal. Mar. 31, 2017) ("California law require an arbitration agreement

19  to have only a modicum of bilaterality."). Moreover, the TOS provides that unless "the parties agree

20  otherwise, any arbitration hearings will take place in the county (or parish) . . . of Advertiser's

21  principal place of business," Kreins Decl. Exs. A & D, § 13(C), imposing no burden on Plaintiffs to

22  arbitrate. *Compare Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1027 (9th Cir. 2016) (forum

23  selection clause unreasonable "if the forum selected would be unavailable or unable to accomplish

24  substantial justice"). Finally, the TOS requires Google to pay the arbitration fees in many

25  instances. *See* Kreins Decl. Exs. A & D, § 13(D); *Ulbrich v. Overstock.Com, Inc.*, 887 F. Supp. 2d

26  924, 933 (N.D. Cal. 2012) ("requiri[ng] that employees pay a reduced filing fee and that the

27  employer bear many of the hearing fees and costs" held not substantively unconscionable).

28

- 22 -

1    *Second*, the arbitration agreement plainly encompasses Plaintiffs' claims, insofar as it applies

2    to "all disputes and claims . . . that arise out of or relate in any way" to Google's advertising

3    programs.  And the TOS extends to claims based on events that occurred before 2017.  Subsection

4    13(A)(2) expressly covers "claims that arose before Customer or Advertiser first accepted any

5    version of these Terms containing an arbitration provision."  Kreins Decl. Exs. A & D, § 13(A)(2);

6    *Trudeau*, 349 F. Supp. 3d at 878.  "On its face then, the arbitration provision applies to claims arising

7    before the 2017 TOS."  *Trudeau*, 349 F. Supp. 3d at 878.  In view of these authorities, the arbitration

8    issue is no surprise to Plaintiffs—yet their CAC makes no reference to the issue, and nowhere do

9    they challenge the enforceability of the clause.

10    Instead, Plaintiffs added an allegation to their CAC intended to suggest that Plaintiffs view

11    themselves as seeking a public injunction under the UCL: "The primary purpose of such injunctive

12    relief will be to benefit the public from the lower prices and greater innovation that will prevail in

13    competitive digital advertising markets in the absence of Google's monopoly."  CAC ¶¶ 160, 166.  In

14    view of their reference to an injunction that would "benefit the public," Plaintiffs presumably intend

15    to seek application of the Ninth Circuit's recent holding that the California law "prohibit[ion of] the

16    waiver of the right to pursue public injunctive relief in any forum" is not preempted by the Federal

17    Arbitration Act.  *Blair v. Rent-A-Center, Inc.*, 928 F.3d 819, 827 (9th Cir. 2019).  Defendants will

18    respond if and when Plaintiffs make such an argument—the CAC itself does not do so.  But it would

19    make no difference here.

20    As an initial matter, Plaintiffs have no right to a "public injunction" under the Sherman Act,

21    and thus their Sherman Act claim should be dismissed in favor of arbitration.  *See Rogers v. Lyft,*

22    *Inc.*, 452 F. Supp. 3d 904, 919 (N.D. Cal. 2020) ("The public injunction is a creature of California

23    law . . . .").

24    Even with respect to Plaintiffs' UCL claim, the CAC's mere recitation that Plaintiffs seek an

25    unspecified injunction that will "primar[ily]. . . benefit the public" does not stave off

26    arbitration.  "Courts do not take relief styled as a 'public injunction' at face value."  *Ajzenman v.*

27    *Office of Comm'r of Baseball*, 2020 WL 6037140, at *6 (C.D. Cal. Sept. 14, 2020).

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

   *First*, Plaintiffs have not even pled what they are seeking to enjoin; the CAC says simply that Plaintiffs seek "injunctive relief to restore competition in the relevant market and its constituent submarkets." CAC p.35. What exactly Plaintiffs are asking the Court to use its equitable powers to order Defendants to do is identified nowhere in the CAC, which alone warrants dismissal of any claim for a public injunction. *See, e.g.*, *Snyder v. Nationstar Mortg.*, 2015 WL 7075622, at \*11 (N.D. Cal. Nov. 13, 2015) (dismissing UCL claim because "Plaintiff fail[ed] to state what particular unfair business practices she seeks to enjoin," and thus "request for injunctive relief [was] not sufficiently stated") (citing *O'Connor v. Wells Fargo, N.A.*, 2014 WL 4802994, at \*8 (N.D. Cal. Sept. 26, 2014) ("Plaintiff's request for injunctive relief is insufficiently stated; Plaintiff does not specify what the 'threatened conduct' he seeks to enjoin is")); *Parreno v. Berryessa Union Sch. Dist.*, 2010 WL 532376, at \*1 (N.D. Cal. Feb. 8, 2010) ("Parreno's claim for injunctive relief is inadequately pleaded because it fails to specify the relief she seeks[.]").

   *Second*, whatever injunction Plaintiffs intend to pursue, their CAC clearly seeks to benefit only the class of advertisers and publishers that they seek to represent, *i.e.*, "the class of people who stand to benefit from any injunctive relief are necessarily limited only to those individuals who have entered into contractual agreements with [Google], not the public at large." *Johnson v. JP Morgan Chase Bank, N.A.*, 2018 WL 4726042, at \*7 (C.D. Cal. Sept. 18, 2018). *See also, e.g.*, *Rogers*, 452 F. Supp. 3d at 920–21 ("[T]he plaintiffs' decision to label their claim as one for a 'public injunction' seems dubious because the proposed remedy runs directly to the plaintiffs and similarly situated [private parties], with the public benefiting only collaterally."); *Sponheim v. Citibank, N.A.*, 2019 WL 2498938, at \*5 (C.D. Cal. June 10, 2019) (rejecting claim of public injunction where plaintiffs sought relief on behalf of only those who "held Citibank checking accounts"); *Wright v. Sirius XM Radio Inc.*, 2017 WL 4676580, at \*9 (C.D. Cal. June 1, 2017) (no public injunction because relief extended only to lifetime Sirius XM subscribers who had subscriptions canceled).

## CONCLUSION

   For the foregoing reasons, the CAC should be dismissed.

- 24 -

1  DATED:  November 9, 2020                **WILLIAMS & CONNOLLY LLP**

2

3                                          By: /s/ John E. Schmidtlein
                                           John E. Schmidtlein (CA State Bar No. 163520)

4                                          Benjamin M. Greenblum (*pro hac vice*)
                                           WILLIAMS & CONNOLLY LLP

5                                          725 Twelfth Street, N.W.
                                           Washington, DC 20005

6                                          Telephone:  (202) 434-5000
                                           Facsimile:  (202) 434-5029

7                                          Email:  jschmidtlein@wc.com
                                                        bgreenblum@wc.com

8

9                                          *Attorneys for Defendants Google LLC*
                                           *and Alphabet Inc.*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
5:20-CV-03556-BLF