# EXHIBIT A

ROBBINS GELLER RUDMAN
   & DOWD LLP
DANIEL J. PFEFFERBAUM (248631)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
dpfefferbaum@rgrdlaw.com
   – and –
DAVID W. MITCHELL (199706)
STEVEN M. JODLOWSKI (239074)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
davidm@rgrdlaw.com
sjodlowski@rgrdlaw.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| SWEEPSTAKES TODAY, LLC, Individually and on Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>GOOGLE LLC, ALPHABET INC. and YOUTUBE, LLC, )<br><br>Defendants. ) | Case No.<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT AND THE CLAYTON ACT<br><br><br>DEMAND FOR JURY TRIAL |

## TABLE OF CONTENTS

Page

I.     INTRODUCTION ......................................................................................1

II.    THE PARTIES.........................................................................................7

III.   JURISDICTION AND VENUE ................................................................8

IV.    FACTUAL BACKGROUND ...................................................................9

       A.    Background of Online Advertising and Publishing...................9

       B.    Google's History: From Search Engine to Online Advertising Business.............11

V.     GOOGLE BECOMES A MONOPOLY ..................................................13

       A.    Google's Growth to Search Engine Market Dominance ...........13

       B.    Google's Suite of Online Advertising Products and Services Consolidates
             Dominance Across Multiple Markets ........................................14

             1.    Double Click for Publishers and DoubleClick Ad Exchange ...................15

             2.    AdSense and Google Ads ...............................................16

             3.    YouTube ..........................................................................17

             4.    Android Operating System .............................................18

             5.    Google Chrome ...............................................................19

             6.    Other Google Products and Services ..............................19

       C.    Key Acquisitions Expand Google's Ad Tech Capabilities....................19

       D.    The Relevant Markets ...............................................................21

             1.    Relevant Product Markets................................................21

             2.    The Geographic Market ..................................................27

VI.    ANTITRUST LAWS..............................................................................27

VII.   PLAINTIFF SWEEPSTAKES TODAY'S ROLE IN THE DIGITAL
       ADVERTISING MARKET .....................................................................28

VIII.  GOOGLE WIELDS MONOPOLY POWER IN MULTIPLE MARKETS TO
       IMPEDE COMPETITION.......................................................................29

       A.    Google's Anticompetitive Conduct and Manipulation of the Online
             Advertising Market .....................................................................30

|  |  | Page |
|---|---|---|
| 1. | Designing Auctions to Weaken Competitive Sources and Advantage Itself | 30 |
| 2. | Manipulative and Technological Blocking, Exclusion and Downgrading | 32 |
| 3. | Denial of Interoperability and Purposeful Incompatibility | 33 |
| 4. | Cross-Subsidizing Various Functions of the Ad Tech Stack and Predatory Pricing | 34 |
| 5. | Unilateral Setting and Altering of Technological Standards | 35 |
| 6. | Using Google's Significant Data Advantage to Disadvantage Competitors | 39 |
| 7. | Illegal Tying and Bundling of Services | 40 |
| 8. | Google Affirmatively Interferes with Competitors Using Data Harvested from Its Monopolies | 41 |
| 9. | Preferential Treatment of Google Products and Services | 42 |
| 10. | Exclusive Dealing and Anticompetitive Contracts | 43 |
| 11. | Manipulation of the Patent Process | 46 |
| B. | Monopolistic Leveraging | 47 |
| IX. | INTERSTATE TRADE AND COMMERCE | 49 |
| X. | ANTITRUST HARM | 49 |
| XI. | PRIOR ANTITRUST ENFORCEMENT ACTIONS | 52 |
| XII. | PLAINTIFF WAS INJURED AS A RESULT OF GOOGLE'S ANTICOMPETITIVE ACTIONS | 52 |
| XIII. | CLASS ACTION ALLEGATIONS | 54 |
| XIV. | CLAIMS | 56 |
| | PRAYER FOR RELIEF | 62 |
| | JURY DEMAND | 63 |

Plaintiff Sweepstakes Today, LLC ("plaintiff" or "Sweepstakes Today"), individually, collectively, and on behalf of all persons and entities similarly situated, brings this class action under §2 of the Sherman Antitrust Act (the "Sherman Act") and §3 of the Clayton Act, 15 U.S.C. §14, for actual damages, treble damages, punitive damages, declaratory and injunctive relief, costs of suit, pre- and post-judgment interest, and other relief, and alleges as follows:

## I. INTRODUCTION

1.      This is an action under, *inter alia*, the Sherman Act to restrain the anticompetitive conduct of defendants, to remedy the effects of defendants' past unlawful conduct, to protect free market competition from continued unlawful manipulation, and to remedy harm to digital publishers that make available and sell space on their website (or applications) to advertisers.  That harm is the direct result of Google's efforts to expand its occupation and control of the online advertising market to the detriment of publishers, with which it competes to sell ad space.  While it is most often thought of as a search engine, through aggressive expansion Google now owns at least 75 different consumer-facing products, many of which are used to serve digital ads.  It is, by all accounts, a significant competitor for the sale of digital ad space.  One product alone (YouTube) accounts for 20% of all display advertisements sold through the digital ad tech stack.  As discussed below, Google has illegally exploited the opportunities for competitive interference made possible by its control over the various firms that connect publishers and advertisers, to benefit its own properties and harm rival publishers.

2.      Plaintiff Sweepstakes Today is an online publisher and a direct competitor of Google.  Since 2004, Sweepstakes Today has operated a website through which it has offered and sold space to digital advertisers on which they run ads so that visitors to its website can view the advertisers' offers.  For nearly a decade, Sweepstakes Today was a successful, profitable company, earning approximately $150,000 per year.

3.      All of that changed in 2012, however, as Google LLC, through both acquisitions and vertical integration, began consolidating the various markets that together constitute the online advertising market, driving out rivals, and became a direct horizontal competitor of publishers such as Sweepstakes Today.  Google, as a direct result of the illegal conduct described herein, has

economically harmed Sweepstakes Today, driving it to the brink of unprofitability and costing it hundreds of thousands of dollars in annual revenue. If it is allowed to continue its practices, Google will likely, as it already has with many other publishers now excluded from the market, put Sweepstakes Today out of business and further cement its stranglehold over the digital advertising market.

4. At its core, Google, and its parent Alphabet Inc., are in the business of digital advertising, services from which they derive the vast majority of their revenues. In 2019, Alphabet reported a staggering $162 billion in revenues, out of which $135 billion resulted from Google advertising revenues.[1] Users of the Google search engine do not pay a monetary fee; rather, Google collects personal data from the users of its search engine and monetizes that data to drive online advertising revenue. In essence, Alphabet and Google are brokers of Internet user data for online advertising profits.

5. For years, Google's goal has been to maximize profits in the online advertising market by: (1) amassing and controlling Internet user data, creating user super-profiles; (2) strategically acquiring companies that strengthen Google's ad tech capabilities, maximize user and competitor data harvesting, or decrease competition; (3) controlling the devices and tools with which users and competitors access the Internet; and (4) ultimately controlling which advertising content is served to and consumed by Internet users.

6. Google has achieved monopoly power in a number of overlapping markets, all with a goal of dominating digital advertising. Google is the world's largest and most accessed search engine, with an overwhelming market dominance – well over 90%. Google possesses monopoly power in the market for general online search (hereinafter the "Internet Search Market") and numerous interrelated and overlapping markets, including but not limited to the Search Advertising Market, Online (or digital) Advertising Market, Publisher Ad Serving Market, and the Market for Intermediating Ad Services. Google is also dominant in the Web Browser Market.

---

[1] *Investigation of Competition in Digital Markets, Majority Staff Report and Recommendations*, H. R. Subcomm. on Antitrust, Com. & Admin. L. of the Comm. on the Judiciary (2020) (hereinafter "House Antitrust Report") at 206.

7.    Google's breathtaking monopoly power has been amassed and maintained by engaging in strategic acquisitions and illegal anticompetitive practices for many years,[2] using its market dominance in several overlapping markets to drive online advertising dollars.  Specifically, Google has monopoly power in the following markets:

- Internet Search Market – 92% monopoly;[3]

- Online Advertising Market – over 50% monopoly;[4]

- Publisher Ad Serving Market – 90% monopoly;[5]

- Ad Exchange Market – 53% monopoly;[6]

- Advertising Ad Serving Market – 80-90% monopoly;[7]

- Web Browser Market – 66% monopoly;[8]

- Licensable Mobile Device Operating Systems – Android OS – 75% monopoly;[9] and

- Search Advertising Market – 80% monopoly.[10]

---

[2]    House Antitrust Report at 14.

[3]    *Search Engine Market Share Worldwide*, StatCounter Glob. Stats, https://gs.statcounter.com/search-engine-market-share (last visited Dec. 11, 2020).

[4]    House Antitrust Report at 206 ("Google is a prominent player in both search advertising and digital display advertising, and it captures over 50% of the market across the ad tech stack, or the set of intermediaries that advertisers and publishers must use to buy, sell, and place ads. Specifically, Google runs the leading ad exchange, while also running buy-side and sell-side intermediary platforms trade on the exchange.").

[5]    Patience Haggin & Kara Dapena, *Google's Ad Dominance Explained in Three Charts*, Wall St. J. (June 17, 2019), https://www.wsj.com/articles/why-googles-advertising-dominance-is-drawing-antitrust-scrutiny-11560763800.

[6]    *Ethical Advertisement Networks*, Wonder (Nov. 19, 2019), https://askwonder.com/research/market-size-ethical-advertisement-networks-f850yy5ld.

[7]    *Online platforms and digital advertising: Market study final report*, Competition & Mkts. Auth. (July 1, 2020) at 20.

[8]    *Browser Market Share Worldwide*, StatCounter Glob. Stats, https://gs.statcounter.com/browser-market-share (last visited Dec. 11, 2020).

[9]    Stacy Cowley, *The smartphone market's radical shakeup*, CNN Bus., Jan. 29, 2013, https://money.cnn.com/gallery/technology/mobile/2013/01/29/smartphone-market-share.index.html; *Mobile Operating System Market Share Worldwide*, StatCounter Glob. Stats., https://gs.statcounter.com/os-market-share/mobile/worldwide (citing 76.2% share) (last visited Dec. 14, 2020).

8.      Google uses its dominance in these overlapping markets to wipe out competition, drive its online ad sales and charge supra-competitive prices.  Google is the largest monopoly in United States history.  These markets comprise a heavily intertwined ecosystem, and the products and services themselves are the means by which defendants' anticompetitive conduct is largely carried out.  Because Google performs every function in the digital advertising chain that connects publishers and advertisers, it is nearly impossible for publishers to do business with advertisers except through Google.  And when publishers have tried to do so, Google has promptly stamped out those efforts and prevented any real competition.  Google is now in the unusual position of representing both buyers (advertisers) and sellers (publishers), while also being in control of the exchange (which sets the auction and pricing rules) through which they interact, giving Google the incentive and ability to bias ad auction rules and prices in its own favor, which it has done for many years.  Using these pressure points, Google has affected the prices paid by advertisers and the amount ultimately received by the publishers, keeping a supra-competitive portion for itself.

9.      Since gaining control, Google has deployed a number of anticompetitive measures to exclude and disadvantage its rivals in the publisher end of the intermediation chain – including Sweepstakes Today – in the supply of advertising inventory.  Google is not only able to use its monopoly power to engage in traditional anticompetitive behavior, but it also physically and technologically blocks competitors from the market through its own products and services.

10.      Indeed, through its ad server and related advertising intermediation products, as well as through its Chrome web browser, Google controls how publishers can participate in that online advertising market and connect with advertisers.  And through its complete dominance of online search, it controls how, when, and even if users can access the countless websites on which these ads are shown and accessed.  All the while, Google feeds its monopoly power by amassing more user data.

11.      To maximize their advertising profits, to protect their valuable monopolies against competitive threats, and to extend their monopolies globally and across the entire digital advertising

---

[10]      *Google's share of the search ad market is expected to grow*, Vox (Mar. 14, 2017), https://www.vox.com/2017/3/14/14890122/google-search-ad-market-share-growth.

chain, defendants have engaged in a series of inorganic strategic acquisitions, anticompetitive contracts and anticompetitive tactics designed to thwart competition on the merits.  This conduct includes, but is not limited to:

- Strategic and inorganic acquisition of ad tech companies and online platforms to grow and maintain market power (*see, e.g.*, ¶¶68-76);

- Exclusionary disablement and disparagement of competitors' products and services to disadvantage, foreclose and punish its competitors (*see, e.g.*, ¶¶138, 150-158);

- Designing auction processes that cement its own market power and raise rivals' costs (*see, e.g.*, ¶¶101-110);

- Advantaging itself through arbitrage and cross-subsidization opportunities made possible because it operates at all levels of the advertising intermediation value chain (*see, e.g.*, ¶¶101-121);

- Exercising its control over the ad tech stack to weaken competitive sources of advertising supply for publishers (*see, e.g.*, ¶¶107-110);

- Leveraging its power in general search and search advertising, where it holds monopoly power, to coerce advertisers to use Google products to access the online advertising market (*see, e.g.*, ¶¶163-172);

- Tying or bundling, including technological tying, of Google products and services (*see, e.g.*, ¶¶137-140);

- Unilateral or surreptitious setting or altering technological standards by which products and services of competitors can be accessed and used (*see, e.g.*, ¶¶122-132);

- Manipulative and technological blocking, exclusion, or downgrading of competitors' products and services (*see, e.g.*, ¶¶111-112);

- Preferential treatment of its own products and services, including exempting YouTube but not competitors from Google-imposed technology and operating standards, and prioritization of its own products and services through manipulation of its algorithms (*see, e.g.*, ¶¶122-130);

- Obscuring and keeping secret key market information as to function, pricing and data so as to disadvantage competition and restrict competitive pricing (*see, e.g.*, ¶¶46, 49, 82, 116-117);

- Denial of interoperability and purposeful incompatibility to exclude entry by competitors or raise their costs and/or coerce them to use Google products and services (*see, e.g.*, ¶¶113-117);

- Gathering and using market intelligence about competitors through the Google and YouTube search engines and Google products and services to disadvantage competitors and interfere with competitors' businesses (*see, e.g.*, ¶¶133-136, 141-142);

- Engaging in predatory pricing and triangular predatory pricing by offering free services in some areas while extracting huge ad revenue margins elsewhere (*see, e.g.*, ¶¶118-121); and

- Manipulation and abuse of the patent process and attendant patents (*see, e.g.*, ¶¶159-162).

The above-referenced improper activities will be referred to herein collectively as the "Defendants' Anticompetitive Restraints."

12.     There is significant interplay among these markets that makes Google's monopolistic power in these markets more insidious.  In addition to the anticompetitive restraints listed above, defendants have illegally used and leveraged their monopoly power and market dominance both to maintain dominance in those markets already monopolized by Google, as well as to gain further dominance in related markets and further stamp out competition.  Substantial barriers to entry further assist in consolidating Google's market power and online dominance.

13.     Defendants' Anticompetitive Restraints are concerted attempts to maintain and extend defendants' monopolies, not by innovation or other competition on the merits, but rather by anticompetitive tactics that deter innovation, exclude competition, and rob customers of quality products and their right to choose among competing alternatives.

14.     Defendants' illegal conduct has been setting off alarm bells worldwide for many years.  In October 2020, following a year-long investigation, the U.S. Justice Department ("DOJ") filed a civil antitrust lawsuit to stop Google from unlawfully maintaining monopolies in the search and search advertising markets and to remedy the competitive harms.[11]  The time has come to address these market abuses.

---

[11]     Beyond the DOJ complaint, Google's monopolistic conduct has been the subject of numerous past and ongoing investigations and enforcement actions by regulatory bodies throughout the world. Google has been the subject of numerous investigations by the Federal Trade Commission ("FTC"). And Google has been charged with anticompetitive conduct by regulatory agencies in the European Union, France, South Korea, India, and Russia, resulting in billions of dollars of fines.  The recently

## II.    THE PARTIES

15.    Plaintiff Sweepstakes Today, LLC is a limited liability corporation organized and existing under the laws of the State of Oklahoma, with its principal place of business located at 2914 South 122nd East Avenue, Tulsa, Oklahoma 74129.   Plaintiff operates a website, Sweepstakestoday.com, that provides online access to sweepstakes, contests, promotions, and drawings offered by large, well-known companies and corporations.  Plaintiff is an online publisher. On its sweepstakes website, it integrates and shows digital advertisements and generates revenue by displaying these ads, including ads selected, placed and served or filled through Google's advertising and publishing products and applications.

16.    Defendant Google LLC is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California.  Google is the world leader in general Internet search conducted on all devices.  It also is the owner of the Android OS and several popular and exclusive mobile and tablet applications, including YouTube, Google Maps, and Gmail.

17.    In August 2015, Google announced its intention to create a new holding company, defendant Alphabet Inc.  The reorganization was completed on October 2, 2015.  Since then, Google has been a wholly-owned subsidiary of Alphabet, which has continued to be the umbrella company for the Internet interests of Google.  Once Alphabet was formed in 2017, Google changed from a corporation to a limited liability company (LLC).

18.    Defendant Alphabet Inc. is a Delaware corporation with its headquarters and principal place of business at the "Googleplex" in Mountain View, California.  Defendant Alphabet is one of the top ten largest companies in the United States with more than $162 billion in annual revenue. Alphabet, ranking 15th in the list of Fortune 500 companies, is traded on the NASDAQ under the symbol "GOOGL" and is included in the S&P 100 Index.

19.    Defendant YouTube, LLC ("YouTube") is a wholly-owned subsidiary of Google LLC and headquartered in San Bruno, California.  YouTube, Inc. was originally registered as a

---

released House Antitrust Report noted the same, stating that: "For years Google has been the subject of antitrust investigations and enforcement actions around the world."  House Antitrust Report at 176.

corporation in Delaware in October 2005 and was converted into YouTube, LLC a year later. According to YouTube's Terms of Service: "The entity providing the Service is Google LLC, a company operating under the laws of Delaware, located at 1600 Amphitheatre Parkway, Mountain View, CA 94043 (referred to as 'YouTube', 'we', 'us', or 'our'). References to YouTube's 'Affiliates' in these terms means the other companies within the Alphabet Inc. corporate group (now or in the future)."

20.     Collectively, defendants are operated and controlled as a single entity, with Sundar Pichai acting as the CEO.  Not only did Google essentially create Alphabet as a holding company in 2015, but virtually all of Alphabet's revenues come from Google.  YouTube, in turn, is a wholly owned subsidiary of Google and is controlled and operated as such.  Alphabet filed its 10-K and 10-Q statements with the Securities and Exchange Commission, reporting consolidated revenues for all of the defendants.  In fact, these statements expressly define Alphabet as "Alphabet Inc. and its subsidiaries."  *See, e.g.*, Alphabet Inc., Quarterly Report (Form 10-Q) (July 30, 2020), at 2.

21.     As discussed below, Google provides publishing services through its stable of advertising products and applications, including, without limitation, Google Ads, the AdSense program, AdX, DoubleClick for Publishers or DFP, and Google Ad Manager.  Plaintiff is a user, customer and/or consumer of these products and services and a participant in the Online Advertising Market set forth herein.

**III.     JURISDICTION AND VENUE**

22.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§1331 and 1337, §2 of the Sherman Act, 15 U.S.C. §2, *et seq.*, and §§3, 4 and 16 of the Clayton Act, 15 U.S.C. §§14, 15 and 26, because plaintiff alleges violations of federal law.

23.     Venue is proper in this district under 15 U.S.C. §§15, 22 and 26 and under 28 U.S.C. §1391(b) and (c) because: (1) Google transacts business and is found within this district; and (2) a substantial portion of the events giving rise to the claims herein occurred within this district.

## IV.    FACTUAL BACKGROUND

### A.    Background of Online Advertising and Publishing

24.    The Internet reaches billions of people around the world and serves as a virtual marketplace for products, information, and ideas.  Given the number of online visitors, this is an attractive forum for advertisers.  Growing revenues derived from the sales of advertising space have driven the explosion of information available on the web since the first banner ad was displayed in 1993.

25.    Online or digital advertising consists of marketing advertisements, which are delivered through the Internet on both desktop and mobile devices.  Online advertising involves the use of the Internet as a medium to obtain website traffic and target and deliver marketing messages to the right users, customers, and consumers.  In most cases, the decision of which ad is served/shown to the user is made in real time, in response to the search term entered by the user (in the case of search advertising) or in response to information about likely characteristics of the person viewing the advertisement (in the case of display advertising) or the context of the page being viewed.

26.    The online advertising ecosystem consists of different types of advertising-technology platforms and intermediaries that all play a role in the creation and execution of an online advertising campaign.  Like other advertising media, online advertising often includes: (1) a publisher, who sells space on their website to advertisers and integrates advertisements into its online content; (2) an advertiser, who provides the advertisements to be shown; and (3) advertising agencies that help create and place the ads.  The goal of online advertising generally is to put an advertisement in front of the best possible audience for that ad.  A view of the ad by an Internet user is commonly referred to as an "impression."

27.    Many publishers rely on the sale of advertising space on the website(s) or application(s) they operate as their primary source of revenue.  This advertising space is filled with a type of digital advertising known as display advertising, which appears on a website or application that a user has chosen to view – such as USAToday.com or WSJ.com – and is often shown in a side

window or another dedicated space on the web page. Display ads account for roughly half of the digital advertising market.

28.    Like search advertising, buying and selling display ads (including online video ads) often involves real-time bidding. Online advertising campaigns are run through various pieces of advertising technology or "ad tech."

29.    One main piece is an "ad tech stack," which refers to the series of companies and technologies on the Internet that gets an advertiser's message in front of the right consumer at the right time to maximize the chance for the advertisement to influence the consumer to take some desired action. Today, the ad tech stack facilitates the automated selling and buying of digital ad inventory on a large scale in real time.

30.    Below is a graphic representation of the various products and services that comprise the ad tech stack:



31.    Ad servers are used by publishers, advertisers, ad agencies, and ad networks to manage and run online advertising campaigns. Ad servers make instantaneous decisions about what ads to show on a website, and then place the ad onto that site. Additionally, ad servers collect and report data (such as the number of impressions and clicks) for advertisers to gain insights from and monitor the performance of their ads, including the efficacy of placing an ad with a particular publisher. Ad servers are used to manage and display online advertising content to the right user on a website. The ad server: (1) determines which ads to display on the publisher's website based on collected user data and preferences across publishers; (2) serves the ad to the user; and (3) collects and reports on additional data such as impressions and clicks, which is used to determine the cost to the advertiser and the amount of money paid to the publisher.

32.    Additional technologies in the ad tech stack include supply-side platforms ("SSPs"), which help publishers sell unused ad space (or inventory) and demand side-platforms ("DSPs"), which are used by advertisers to buy ad impressions from ad exchanges for the cheapest price. The

1   ad formats can include: display, mobile, search, or video ads.  Display advertising, as well as online

2   video advertising, use SSPs and DSPs.   Together, the publisher ad servers, SSPs, advertiser ad

3   servers, and DSPs comprise the ad tech stack.

4       B.      **Google's History: From Search Engine to Online Advertising Business**

5       33.     Google runs the leading ad exchange, while also running the buy-side (advertisers)

6   and sell-side (publishers) intermediary platforms that trade on the exchange.  Google is the dominant

7   player in both search advertising and digital display advertising, and according to the October 2020

8   House Antitrust Report, it captures over 50% of the market across the ad tech stack, or the set of

9   intermediaries that advertisers and publishers must use to buy, sell, and place ads.  The Publisher Ad

10  Serving Market is particularly concentrated, with Google and its products having a 90% market

11  share.  Most publishers can monetize their space only through Google-dominated ad tech stack.

12      34.     Google began as a general online search engine – a two-sided platform that enabled

13  users to search the Internet for content.  While at first it simply indexed the content of web pages,

14  Google's key innovation, the PageRank algorithm, helped define second-generation search

15  technology by looking at links to and from other web pages as a way of determining relevance for

16  users.

17      35.     Google operated at a loss for the first two years.  In 2000, Google began to monetize

18  its search engine, and launched AdWords, an online advertising service that let businesses purchase

19  keyword ads to appear on Google's search results page.  This offering evolved to become the heart

20  of Google's business model.  Google turned its first profit in 2001.

21      36.     The multi-sided nature of Google's general search platform, which connects distinct

22  but interdependent demands, offers Internet users a service purportedly "free of charge."  This

23  consumer strategy (which Google employs with various products and services) attracts users, who

24  are critical assets that allow Google to sell advertising space to companies that are interested in

25  reaching those users.  In this way, Google connects users' demand for information, products, and

26  services with advertisers' and publishers' demand for access to those users.   While Google's

27  dominant business model suggests that users receive "free" access to services, the exchange in fact is

28  for the commercial use of an individual's personal data, which is critical for attracting billions of

dollars in advertising revenue. Google then stores and monetizes this data through its proprietary algorithms.

37. Today Google is ubiquitous across the digital economy, serving as the infrastructure for core products and services online. It has grown and maintained its search engine dominance, such that "Googling" something is now synonymous with online search itself. The company is now also the largest provider of digital advertising, a leading web browser, a dominant mobile operating system, and a major provider of digital services such as mapping, email, cloud computing, voice assistant services, as well as dozens of other offerings.[12] Each of these services provides Google with a trove of user data, reinforcing its dominance across markets and driving greater monetization through online advertising.[13]

38. As Google's dominance and market power in Internet search grew and its product and service offerings diversified, Google captured user data and critical information about users, such as personally identifiable information, user impressions and preferences, location, browsing history, IP address, and insight into patterns, timing, trends, and demographics. At the same time, Google strategically acquired ad tech companies and competitors that provided the ad tech services Google needed to facilitate advertisers' placement of ads onto publishers' websites. This combination has enabled Google to build a data set for its ad tech services utilizing the user data from its search engine and other customer facing properties, such as Google Maps and Gmail, providing Google with an unparalleled ability to target ads to the right viewers.

39. Over time, Google's ad offerings have become considerably more sophisticated, resulting in tens of billions of dollars of annual revenue. These services now include, *inter alia*, search campaigns, display campaigns and online video campaigns, which can be implemented and viewed across multiple devices, and the buying and selling of which is facilitated through Google's suite of ad tech services. Moreover, Google's market power in search enables Google to harvest

---

[12]     House Antitrust Report at 174.

[13]     House Antitrust Report at 175.

1  data generated not only by Internet users, but also by competitors, publishers, advertisers and

2  intermediaries, and further monetize and utilize the same.

3       40.    Today, Google's ad-based revenue model generates the vast majority of Google's

4  revenues, yielding billions in revenue each year as reflected in the following chart:



15  For example, in the third quarter of 2019, defendants' advertising revenues hit a record $33.9 billion.

16  **V.    GOOGLE BECOMES A MONOPOLY**

17      A.    **Google's Growth to Search Engine Market Dominance**

18       41.    Google's flagship online service is its general search engine, Google Search, which is

19  accessible either through Google's main website (www.google.com) or through localized websites.

20  Search engines, such as Google, Yahoo, Baidu and Bing, utilize automated software applications

21  (referred to as robots, bots or spiders) that travel along the Web and gather information used to

22  create a searchable index of websites.

23       42.    Google Search is ubiquitous, existing for static devices (personal computers and

24  laptops), for handheld and mobile devices (smartphones and tablets), and for other smart devices,

25  such as Google Home or devices running Android TV or Android Auto operating systems.

26  Additionally, Google also powers other search engines – including Ask, which is the sixth largest

27  search engine in the world.

28

43.     When a user enters a keyword or a string of keywords (a "query") in Google Search, Google's general search results pages return different categories of search results, including: (1) generic search results; (2) specialized search results; and (3) online search advertisements.

44.     Generic search results typically appear on the left side of Google's general search results pages in the form of blue links with short excerpts ("snippets") in order of their rank.  Generic search results can link to any page on the Internet, including web pages of specialized search services that compete with Google's own specialized search services.

45.     To rank generic search results in response to a query, Google uses algorithms, including an algorithm called PageRank.  PageRank ostensibly measures the importance of a web page based on the interest in the page, as well as the number and quality of links to that page, the underlying assumption being that more important websites are likely to receive more links from other websites.  Google applies a variety of adjustment mechanisms to the results of PageRank, which adjustments are determined by Google.  Through PageRank and the adjustment mechanisms, Google determines and can manipulate the rank of a web page in the generic search results on Google's general search results pages.

46.     Google's clear dominance in online search also gives it significant control over the data generated by publishers and advertisers and allows Google to maintain its dominant position over digital advertising.[14]  Through this generic search process, Google has attained long-recognized and substantial market power and monopoly status in both the Internet Search Market and the Online Advertising Market.

B.     **Google's Suite of Online Advertising Products and Services Consolidates Dominance Across Multiple Markets**

47.     For years, many different businesses offered the various complementary products and services that together accomplished the task of matching publishers with advertisers and arranging payment from the advertisers to the publishers who provide that space.  This, however, is no longer the case.

---

[14]     House Antitrust Report at 196.

48.     Over time, Google expanded its offerings to include a suite of publishing and advertising products and services through which it controls the digital advertising intermediation chain.  These offerings were facilitated largely through Google's strategic acquisition of ad tech companies and competitors that provided the ad tech services Google needed to facilitate advertisers' placement of ads onto publishers' websites.  Virtually every part of the digital advertising chain is now controlled by a single company: Google.

49.     Once Google seized control over the market, it also shrouded the entire process of buying and selling ads in secrecy, as discussed further below.  As the House Antitrust Report recognized, "this process lacks transparency."[15]  Google intentionally withholds from publishers and advertisers key information about its services, such as how much their space sold for and how much Google keeps, making it difficult for publishers and advertisers to understand the value that Google's intermediation services provide.  Nor are publishers able to confirm that the auctions are conducted fairly.

### 1.     Double Click for Publishers and DoubleClick Ad Exchange

50.     Google's DoubleClick for Publishers, or DFP, is Google's ad server that enabled advertisers to upload advertiser/ad network creative advertisements and tags (HTML codes that call other ad networks and exchanges for ads).  When there is an opportunity (or an ad call), DFP selects which ad will be served based upon the accumulated data and preferences of the individual user.  Thus, through DFP, Google instantaneously controls the vast majority of how, when, where and which ads are served to users on the Internet.  A recent *Wall Street Journal* article lays out the inner workings of Google's multi-billion dollar advertising conglomerate.[16]

51.     DoubleClick Ad Exchange or AdX is Google's auction-based system for premium websites to be paired with premium advertisers.  Google AdX is more exclusive than Google Ad Manager and can only be accessed in two ways.  First, one could obtain a Google Ad Manager account and then get Google's approval to access the AdX account.  Alternatively, AdX can be accessed by

---

[15]     House Antitrust Report at 129-30.

[16]     Keach Hagey & Vivien Ngo, *How Google Edged Out Rivals and Built the World's Dominant Ad Machine: A Visual Guide*, Wall St. J., Nov. 7, 2019.

working with a Google Certified Publishing Partner, through which a publisher can obtain a subsidiary AdX account.  In both cases, only large publishers approved by Google can use AdX.

### 2. AdSense and Google Ads

52. AdSense enables publishers to reserve space for the placement of Google Ads on their own website (via text, video or images) and thereby monetize their own website content.  AdSense is used to sell advertising space to Google.

53. Google Ads (formerly AdWords) enables businesses and marketers to advertise on Google's network (search, display, etc.).  Google Ads is used to buy advertising space from Google.  Google Ads works by displaying a provider's ad when people search online for the products and services that provider offers.  Google Ads is powered by an auction bidding market.  Each time an ad is eligible to appear for a search, it goes through the ad auction.  The auction determines whether the ad actually shows and in which ad position it will show on the page.  To gain the top spot in Google advertisements, advertisers have to outbid each other.  Higher bids move up the list, while low bids may not even be displayed at all.

54. Cost per impression (or "CPI") is the cost or expense incurred for each potential customer who views the advertisement, while cost per thousand impressions (or "CPM") refers to the cost or expense incurred for every thousand potential customers who view the advertisement.  CPI, along with pay-per-click ("PPC") and cost per order, are used to assess the cost-effectiveness and profitability of online advertising.

55. How often an ad shows, its position on the page, and how much the ad costs are all purportedly driven by two factors: the advertiser's bid and the projected quality of the ads (via a subjective "Quality Score").  However, other factors determined by Google, including acceptable and bespoke minimum bids, are also accounted for in the determining the winning bid.

56. Importantly, Google not only runs the auction, but also competes in it.  While this process is held out by Google to be neutral and unbiased, Google alone controls the algorithms that generate Google Ads results, the Quality Score assigned to the search advertisements, and the minimum bids that a given advertiser can offer in the auction.  As a result, the changing or selective application of Google's auction process and/or algorithms can effectively box out competition and

limit consumer choice on what may or may not be purchased, and from whom, based upon what advertisements "win" the auction.

57. The three most common Google Ads campaign types are:

- *Search campaigns* – usually in text form, these ads show on Google Search results pages when the user searches for a particular product or service;

- *Display campaigns* – usually in image form, these ads appear on websites or apps that consumers visit; and

- *Video campaigns* – these are digital advertisements, usually 6 or 15 second videos, that show right before or during substantive video content.

58. Google's video campaigns can run in a number of formats, including in-stream ads, video discovery ads, non-skippable in-stream ads, outstream ads, and bumper ads. Specifically, in-stream ads run before, during, or after other videos on YouTube or across the Google network sites, games or apps. These ads may also run on YouTube videos that are embedded on other sites.

### 3. YouTube

59. In October 2006, Google acquired YouTube, an online video-sharing company, for $1.65 billion. Launched by three former PayPal employees in 2005, YouTube is a video-sharing website that allows users to upload, view, rate, share, add to playlists, report, and comment on videos and subscribe to another user's content. YouTube became the fastest growing online video-sharing platform. Google acquired the company just over a year after its launch and it has now become the second largest search engine in the world – second only to Google Search.

60. Approximately 1.3 billion people use YouTube, and it has become the second most visited website in the world. YouTube gets over 30 million visitors per day, who watch an estimated 5 billion videos each day. Three hundred hours of video are uploaded to YouTube every minute.[17]

61. Like most other Alphabet properties, YouTube earns the bulk of its revenue through advertisements.[18] YouTube is estimated to generate between $16 billion and $25 billion in annual

---

[17] *37 Mind Blowing Youtube Facts, Figures and Statistics – 2020,* MerchDope (Feb. 26, 2020), https://merchdope.com/youtube-stats/.

[18] Andrew Beattie, *How YouTube Makes Money Off Videos (GOOG)*, Investopedia (May 27, 2020), https://www.investopedia.com/articles/personal-finance/053015/how-youtube-makes-money-videos.asp.

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT AND THE CLAYTON ACT     - 17 -

revenue, putting it in the top half of the Fortune 500.[19]  YouTube accounts for the second largest

revenue stream generated by Google next to its online advertising business.  Moreover, YouTube is

steadily becoming more valuable to Google due to the growing shift of consumer viewership from

television to online video.

### 4.    Android Operating System

62.    Google understood early on that the shift from desktop PCs to mobile Internet, which

started in the mid-2000s, would be a fundamental change for Google Search and would provide

access to emerging and third-world markets, where mobile devices are significantly more prevalent.

63.    In 2005, Google acquired Android, a developer of an open source mobile device

operating system, or "OS," for $50 million.  In 2015, the Android OS was installed on more than

80% of the world's smartphones.  Google has continued to develop Android and to acquire Android-

relevant patents since that time.

64.    Google's Android is now the most-used smartphone operating system in the world.

Today, over 75% of smart mobile devices worldwide run on the Android OS.[20]

65.    Because Android is a licensable smart mobile operating system, third-party

manufacturers of smart mobile devices can license and run Android on their devices.  As set forth

below in ¶¶170-173, Google's complete and total control of the Android OS has enabled Google to

engage in certain anticompetitive behavior to maintain and solidify its dominance across multiple

markets.[21]

---

[19]    Daisuke Wakabayashi, *YouTube Is a Big Business. Just How Big Is Anyone's Guess.*, N.Y. Times (July 24, 2019), https://www.nytimes.com/2019/07/24/technology/youtube-financial-disclosure-google.html.

[20]    *Mobile Operating System Market Share Worldwide*, StatCounter Glob. Stats, https://gs.statcounter.com/os-market-share/mobile/worldwide (last visited Dec. 11, 2020)

[21]    Defendants' anticompetitive conduct in regard to Android OS has been the subject of numerous regulatory investigations in the United States and abroad.  Most recently, it has been included in the DOJ's October 20, 2020 complaint against Google for violations of the Sherman Act. Additionally, the FTC opened up investigations in 2011 and again in 2015.  In July 2018, the European Commission fined Google a record $5.1 billion in an Android antitrust case for, *inter alia*, illegally tying Google's search and browser apps; illegally making anticompetitive payments conditional on exclusive pre-installation of Google Search; and illegally obstructing the development and distribution of competing operating systems.  In an April 2017 settlement with Russia's Federal Antimonopoly Service, Google agreed to pay $7.8 million in fines and rewrite contracts with

### 5.    Google Chrome

66.    In 2008, Google released its Chrome web browser ("Chrome" or "Chrome Browser"). A web browser is software that retrieves and displays pages from the Internet.  When a user wants to access a certain web page, the web browser fetches information from the relevant server and displays it to the user.  Browsers are used to navigate and spend time on websites and to search the web. Most activities online are made possible through a browser.  Web browsers can be installed on almost any device connected to the Internet.  Google Chrome includes synchronization with Google products and services and is designed to work with YouTube and Gmail.  Google Chrome is used by over 50% of people in the United States and approximately 67% worldwide.  Google's Android OS, discussed in §IV.B.4. above, requires pre-installation of the Chrome Browser under certain circumstances, including, *inter alia*, as a condition of accessing certain Google apps.

### 6.    Other Google Products and Services

67.    Google also has additional product and service offerings designed to attract users and harvest their data.  These services include but are not limited to Google Maps, Gmail, Google Drive, Google Photos, Google Play Store, Google Earth, Google Pay Send, Google Hang Outs, and Google Analytics.

### C.    Key Acquisitions Expand Google's Ad Tech Capabilities

68.    Google has steadily and systematically grown through acquisition of corollary ad tech, web application and online video platform companies.  Since its founding in 1998, Google has acquired more than 227 companies, spending over $27 billion for its top 10 acquisitions.  Rather than growing organically, Google has grown through strategic acquisitions to yield products, manpower, and patent portfolios that directly and indirectly support and maintain its Internet search and other monopolies and feed its online advertising business revenue.

---

smartphone manufacturers under a settlement over Google's self-preference access to the Android operating system.

69.     In addition to the significant acquisitions of YouTube and Android described above, Google has made numerous key acquisitions to enable expansion of its online advertising market dominance and its ad tech capabilities.

70.     In April 2003, Google acquired Applied Semantics for $102 million.  This acquisition was instrumental in the creation of Google's AdSense product.

71.     In April 2007, Google announced its intention to acquire DoubleClick.  Following an investigation by the FTC prompted by antitrust concerns, Google acquired DoubleClick in March 2008 for $3.1 billion.[22]  The DoubleClick acquisition was instrumental in cementing Google's stronghold in the lucrative online advertising industry.  In addition to DoubleClick software, Google also acquired relationships with web publishers, advertisers and agencies, beating a host of other potential buyers like Microsoft to the acquisition.  Integrated into AdSense, DoubleClick has been enormously successful for Google, with almost 83% of Alphabet's $162 billion in revenues in 2019 coming from its advertising business.  Since the acquisition by Google, DoubleClick has further expanded with DFP and DoubleClick Ad Exchange.  When Google purchased DoubleClick, it told Congress and the FTC that it would not combine the data collected on Internet users via DoubleClick with the data collected throughout Google's ecosystem.  In 2016, however, Google reversed this commitment, and subsequently combined DoubleClick data with personal information collected through other Google services – effectively combining information from a user's personal identity with their location on Google Maps, information from Gmail, and their search history, along with information from numerous other Google products.[23]

72.     In 2010, Google acquired AdMob for $750 million and then began acquiring buyer services, including Invite Media for a reported $81 million.  The combination of deals gave Google unprecedented positioning in every facet of how ads end up on websites and smartphone apps around the world.

---

[22]     In 2013, following the appointment of former Google outside counsel Joshua Wright as President Obama's FTC Commissioner and despite a staff memo urging prosecution, the FTC issued two decisions effectively terminating the investigations into Google without any meaningful action against Google.

[23]     House Antitrust Report at 209-10.

73.     In August 2011, Google acquired Motorola Mobility for $12.5 billion, a mobile device manufacturer.  Google acquired Motorola's smartphone patent portfolio, with more than 20,000 patents on mobile phones and wireless technologies, for $12.5 billion.  In the same year – prior to the Motorola acquisition – Google spent $4.9 million on the Mondu patent portfolio of Android-relevant technology.  Moreover, Google bought 1,029 patents related to the Android OS from IBM.  *See* MIT Technology Review, October 2011.[24]

74.     In 2011, Google purchased Ad Meld, one of the largest SSPs, which it integrated into AdX, Google's existing exchange.

75.     In January 2019, Google acquired some of Fossil's smartwatch technology for $40 million.  On November 1, 2019, Fitbit announced an agreement to be acquired by Google for approximately $2.1 billion.  This wearable technology enables significant harvesting of user data, already alarming regulatory agencies.[25]

76.     With these and other acquisitions, Google has maintained its dominance in online search and search advertising, and gained dominance in related markets and market power as set forth below.

D.     **The Relevant Markets**

77.     Insofar as plaintiff is required to plead the relevant product and geographic market to establish the antitrust violations alleged here, plaintiff alleges the relevant markets at issue and has pled how defendants' conduct has harmed competitive processes in these markets.  The contours of the relevant markets are set forth above.  *See* §IV.

1.     **Relevant Product Markets**

78.     Google has a durable monopoly in each of the following markets:

---

[24]     *Google Buys Motorola Mobility for $12.5 B, Says "Android Will Stay Open,"* TECHCRUNCH (Aug. 15, 2011), https://techcrunch.com/2011/08/15/breaking-google-buys-motorola-for-12-5-billion/ (reporting that Google purchased Motorola primarily to protect the Android ecosystem from patent litigation).

[25]     On August 2020, European Union authorities announced an investigation into Google's $2.1 billion purchase of the fitness-tracking company, which raised alarms about the health data the Internet giant would be acquiring as part of the deal.  Javier Espinoza, *EU signals deeper investigation of Google Fitbit deal*, Fin. Times (July 1, 2020), https://www.ft.com/content/aba45bc9-ffc8-411e-ac29-dbb3171f4886.

a. <u>The Internet Search Market</u> – Google overwhelmingly dominates the recognized market for general online search with control over 94% of the search engine market. Despite notable changes in the market – such as the switch from desktop to mobile – Google has maintained this dominance for more than a decade, a period during which its lead over its most significant competitors has only increased. The next largest competitor is Microsoft's Bing, with a market share of about 2.8%.

b. <u>Licensable Mobile Device Operating Systems</u>: Through Android OS, Google is dominant in the worldwide market for Licensable Mobile Device Operating Systems, with a market share of approximately 75%.[26]



c. <u>The Search Advertising Market</u>: Google has approximately 80% market share in the Search Advertising Market followed by Microsoft and Yahoo with 7.2% and 2.5%, respectively.[27]

---

[26] Stacey Cowley, *The smartphone market's radical shakeup*, CNN Bus., https://money.cnn.com/gallery/technology/mobile/2013/01/29/smartphone-market-share/index.html (Jan. 29, 2013); *Mobile Operating System Market Share Worldwide*, StatCounter Glob. Stats, https://gs.statcounter.com/os-market-share/mobile/worldwide (last visited Dec. 11, 2020) (citing 76.2% share).

d.    <u>Online Advertising Market</u>: As the House Antitrust Report recognized, Google dominates this market with more than a 50% market share.[28] Google's power in this market stems from three main sources: its inventory of search and display advertising (including video) and associated large base of advertisers; its data on users; and its strong position in intermediation, particularly as the largest publisher ad server, initially through the acquisition of DoubleClick and other intermediary businesses. Moreover, within the Online Advertising Market, there are at least four relevant and distinct sub-markets over which Google has control, as described below.

i.    <u>Publisher Ad Serving Market</u>: The market for publisher ad serving is highly concentrated, with Google Ad Manager accounting for 90% of the display ads.

ii.    <u>Ad Exchange Market</u>: Google has more than 50% market share in the market for intermediation services such as ad networks and ad exchanges.

iii.    <u>Advertiser Ad Serving Market</u>: The demand side of the ad tech chain – which includes tools used by advertisers to buy ad slots, track users, report revenue metrics, serve ads, and determine how to fill available inventory – is also highly concentrated, with Google accounting for up to 90% of ads served.

79.    Google has or is achieving monopoly power in the following market:

---

[27] Tess Townsend, *Google's share of the search ad market is expected to grow*, Vox (Mar. 14, 2017), https://www.vox.com/2017/3/14/14890122/google-search-ad-market-share-growth.

[28] House Antitrust Report at 206 ("Google is a prominent player in both search advertising and digital display advertising, and it captures over 50% of the market across the ad tech stack, or the set of intermediaries that advertisers and publishers must use to buy, sell, and place ads. Specifically, Google runs the leading ad exchange, while also running buy-side and sell-side intermediary platforms trade on the exchange.").

a.   <u>The Web Browser Market</u>: Google has effectively achieved monopoly power in the Web Browser Market, with an estimated market share of 66% and growing.



80.   The visual of Google's Internet Search Market share can be seen below:



81.     Internet search, search advertising and advertising technology have been recognized as distinct markets and Google's dominance in them has been established.[29]

82.     In addition to Google's market share set forth above, Google's market power in each of the above markets is demonstrated by the interoperability of the Google products within each of the markets; Google's unilateral ability to control how and on what terms market participants can interact with its products and services; Google's collection and weaponized usage of data from its products and services; Google's ability to both set pricing and maintain opacity in the fees its receives for its services; the self-reinforcing advantages of the data it collects for each of its services in garnering additional market share; the unique products and services at issue in this case, which can and have physically and technologically blocked competition on the merits; the minimal strength and capacity of competitors, especially given Google's control of the Internet ecosystem as a whole; the interplay of Google's monopolies with one another; Google's control of substantial relevant patents in the ad tech industry; and Google's infrastructure, which enables it to offer services for free to users of the market.

83.     Each of the above is a market for the purposes of antitrust law.  There are no reasonable substitutes for general Internet search; search advertising; Web Browsers; or licensable mobile operating device systems.  Nor is there a reasonable technological substitute for the digital advertising technology market, or each of the various sub-markets therein.  Each of these markets represents a different set of services performed at each level of the advertising stack and provides particularized functionality in delivering and tracking online advertisements, and these markets are therefore not substitutes for one another.

84.     Likewise, there is no reasonable substitute for online advertising services.  Online advertising is not substitutable with traditional forms of advertising, such a print, television, radio, or billboard advertisements.  Each of these forms of advertising reaches a distinct group of potential

---

[29]     *See* House Antitrust Report at 177, 180, 183, 196, 213; *see also, e.g.*, *Antitrust: Commission sends Statement of Objections to Google on Android operating system and applications – Factsheet*, Eur. Comm'n (Apr. 20, 2016), https://ec.europa.eu/commission/presscorner/detail/en/MEMO_16_1484; F.T.C., *Statement of Federal Trade Commission Concerning Google/DoubleClick*, No. 071-0170, at 5-6 (Dec. 20, 2007), https://www.ftc.gov/system/files/documents/public_statements/418081/071220googledc-commstmt.pdf.

customers, and advertisers and advertising agencies view each of these forms of advertising as complementary rather than as potential replacements for each other. Online advertising also is different in kind from traditional forms of advertising, because it is delivered differently and in a manner that targets the specific individual end user. Additionally, online advertisements can be continuously tracked, updated and improved based on data showing how consumers are responding. Likewise, each of the component markets is not substitutable for the others as they serve a distinct function and different audiences and are reachable by consumers in a different manner. Search (which is pulled) is intent-based advertising that seeks to induce consumers who have already shown an interest in buying a product or service to make a purchase. Display and video (which are pushed), by contrast, are suitable for raising awareness about a product, service, or brand and reaching new audiences that may not yet have shown an interest. Social media advertising is employed on a closed, rather than open network and targeted at users of the social network itself. Moreover, as described above, the publisher ad serving market, ad exchange, and advertiser ad serving markets each represent a different service provided at a different level of the ad technology stack. For example, on the supply side, a publisher ad server helps publishers track users, manage inventory and make the final decision about how to fill available inventory; on the demand side, an advertising ad server helps advertisers buy ad slots. Between these two sit intermediaries, which run the auctions. These are separate functions, and thus are not substitutes for each other.

85.    These durable markets have significant barriers to entry, including, but not limited to, network effects that make platforms more valuable as they gain more users; the advantages of big data, which enable platforms and companies to use the treasure trove of data they collect from users to improve the effectiveness of their products and services; and lock-in effects that cause users to avoid switching platforms or companies so as not to lose their personal contacts, history of searches, photos, apps, and other information. For general search, additional barriers to entry include economies of scale in developing a web index; access to click-and-query data at scale; and Google's extensive implementation of default positions. Also, for the Licensable Mobile Device Operating System Market, there are high barriers to entry, in part due to specific network effects: the more popular an OS is, the more developers write apps for that system – which in turn attracts more users.

Furthermore, significant resources are required to develop and distribute a successful licensable smart mobile operating system.

86.     Defendants' Anticompetitive Restraints have restrained competition on the merits in each of the above markets, including but not limited to the Online Advertising Market. Google's conduct had the intent and effect of suppressing and/or foreclosing competition across markets and in particular in the Online Advertising Market as well as in the digital advertising technology market, in order to consolidate, maintain and gain dominance across markets.

## 2.     The Geographic Market

87.     The United States is the relevant geographic market for the markets defined above.

# VI.    ANTITRUST LAWS

88.     Congress passed the first antitrust law, the Sherman Act, in 1890 as a "comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade." In 1914, Congress passed two additional antitrust laws:  the Federal Trade Commission Act, which created the FTC, and the Clayton Act. With some revisions, these are the three core federal antitrust laws still in effect today.

89.     The Sherman Act is divided into two main sections: §1, which prohibits concerted activity of two or more entities that combine, contract, or conspire in restraint of trade; and §2, which addresses unilateral actions and prohibits monopolization or attempted monopolization in restraint of trade. Specifically, §2 of the Sherman Act establishes three offenses, commonly termed "monopolization," "attempted monopolization," and "conspiracy to monopolize."[30]

90.     At its core, §2 makes it illegal to acquire or maintain monopoly power through improper means. The long-standing requirement for monopolization is both: (1) the possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. To be found unlawful, monopoly power must be accompanied by an element of anticompetitive conduct, often described as "exclusionary" or "predatory" conduct. This

---

[30]     *See, e.g.*, 1 Section of Antitrust Law, Am. Bar Ass'n, Antitrust Law Developments 225, 317 (6th ed. 2007).

includes both conduct used to acquire a monopoly unlawfully and conduct used to maintain a monopoly unlawfully.

91.     Section 2 also proscribes "attempt[s] to monopolize."  Establishing attempted monopolization requires proof (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.

92.     Section 3 of the Clayton Act, 15 U.S.C. §14, prohibits exclusionary practices, such as tying, exclusive dealing, and predatory pricing, that lessen competition.  The Clayton Act allows for monetary penalties that are three times as large as the harm caused by the illegal behavior.

## VII.   PLAINTIFF SWEEPSTAKES TODAY'S ROLE IN THE DIGITAL ADVERTISING MARKET

93.     Sweepstakes Today is a digital media publisher that provides services to online advertisers.  As a publisher, Sweepstakes Today facilitates the buying and selling of advertising space on its website (known as a publisher's inventory) either via an auction, or by selling space directly to an advertiser, where ads can be shown.  Sweepstakes Today manages the distribution and delivery of digital advertising content, by allowing brands to deliver advertisements to inform prospective customers of their goods and services.

94.     Google and Sweepstakes Today are competitors in the Online Advertising Market. Google provides services similar to those provided by Sweepstakes Today and has a significant market position as a supplier of space for digital ads.  In 2015, Google and Facebook, who hold a duopoly on the supply of display advertising, accounted for 75% of all new online ad spending. YouTube alone constitutes up to 10% of total display supply.  Through its stable of advertising products and services, Google supplies Sweepstakes Today with advertisements to populate its blank advertising space, which advertisements are served or filled by Google's ad server and are targeted to the individual user who is visiting Sweepstakes Today's website.  Like Google, online advertising sales are Sweepstakes Today's main revenue source.

95.     Between 2008 and 2012, Sweepstakes Today garnered digital advertising revenue of up to $150,000 annually.  By 2012, Sweepstakes Today had become the number one result in the

1   world for the Google search engine keyword "Sweepstakes," out of more than 100 million pages per

2   day.

3        96.    Sweepstakes Today is a user, customer and consumer of Google products and

4   services and a participant in markets Google monopolizes.  As a result of Google's market

5   dominance, publishers such as Sweepstakes Today have no choice but to use some of Google's

6   publishing and ad intermediation services, including DoubleClick, Ad Manager and AdSense.

7   Sweepstakes Today also relies on both Google's Ad Server and Chrome Browser.  To reach the

8   majority of the market, Sweepstakes Today must use Google products to function as the delivery

9   method for both display advertisements or creatives.

10        97.    While the Google DoubleClick and Ad Manager programs deliver the advertisements

11   displayed on Sweepstakes Today's websites, it is Google's algorithms that are responsible for the

12   delivery pattern, frequency and pace of the ads appearing on Sweepstakes Today's digital properties.

13   Google's software stores and manages what ads appear on Sweepstakes Today's sites.

14        98.    92% of consumers use Google's search engine; 80% of consumers use Google for

15   search advertising; 75% of consumers use Google's Android OS to search the Internet and more than

16   66% of users worldwide view websites, online video and the associated video advertisements

17   through Google Chrome.  Google is the digital infrastructure, without which there is no market.

18   Using the data advantage its gains through its search engine, Android OS, and Chrome Browser, as

19   well as the rules it sets through its ad intermediation software, Google has made it virtually

20   impossible for publishers and advertisers to do business with each other except through Google and

21   its ad technology services.

22   **VIII.   GOOGLE WIELDS MONOPOLY POWER IN MULTIPLE MARKETS TO**
**IMPEDE COMPETITION**

23

24        99.    Google is a monopolist in the digital advertising, publisher and advertiser ad serving

25   and ad exchange markets.  Google aggressively uses its monopoly positions, and the money that

26   flows from them, to continuously foreclose rivals and protect its monopolies.

27        100.   As described below, Google has willfully maintained and extended its monopolies

28   through a wide variety of anticompetitive conduct, including excluding and preventing entry by

competitors, raising its rivals' costs, and forcing publishers and advertisers to rely on Google's intermediation services to effectuate sales.

A. **Google's Anticompetitive Conduct and Manipulation of the Online Advertising Market**

1. **Designing Auctions to Weaken Competitive Sources and Advantage Itself**

101.    Google occupies the entire digital advertising chain linking publishers to advertisers and on numerous occasions has used its structural advantage for competitive interference.  In the publisher ad serving market, Google wields overwhelming power and has a share of up to 90% of the market.  Google's control over this stage of the ad tech stack is particularly important because it is the ad server that decides which advertisement wins the right to be displayed on a publisher's webpage.

102.    To compete in the Online Advertising Market, a company's services must be compatible with Google's ad products and services and Google's Chrome Browser.  Importantly, this enables Google to influence industry standards in its own favor and to set arbitrary and anticompetitive rules by which display content is enabled, viewable and audible in ways that preference Google, YouTube and Google's products and services.  In this way, Google has illegally abused its monopoly power through its algorithms, its arbitrary rules for advertisers and marketers, and certain technological changes.

103.    Google has made changes to its ad software to engage in self-preferencing, including, in particular, through a Last Look feature, which harms rival exchanges by suppressing competition on the merits, raises rivals' costs, reduces publishers' revenue and suppresses alternative auction processes.  Plaintiff Sweepstakes Today has been economically harmed by this practice.

104.    Traditionally, bidding for impressions was done sequentially in a "waterfall" auction – that is, a publisher passes its inventory from ad network to ad network in descending order of importance until all impressions are (hopefully) sold.  The ad networks are usually ranked according to the average historic yield they have produced for the publisher.  This means that an ad network

1    where premium inventory has been sold in the past (for a higher price) will then get first chance on

2    further impressions from the same publisher.

3          105.    In 2014, however, Google introduced a feature, called "Last Look," that changed the

4    way in which bids were accepted. Last Look was a feature that allowed Google the opportunity to

5    bid on every impression and consequently always outbid other publishers. The DoubleClick

6    AdExchange would wait for other exchanges to submit their bids before making its own, a dynamic

7    that left Google always in a position to outbid its rivals. By having the "last look," Google's

8    exchange could simply bid $5.01 when the highest bid for a particular user from another exchange

9    was $5. Google would effectively be first in line and would assess whether the impression was a

10   valuable user or instead a low-value impression.

11         106.    The next exchange in line was aware that it was bidding after Google and, because it

12   was operating at an informational disadvantage to assess the quality and value of the impression, it

13   would likely submit a bid at a much lower price (if it bid at all). Over time, because the exchanges

14   bid at such low levels, it depressed the bids and payments to publishers, harming publishers. It also

15   foreclosed competition in the ad tech market because non-Google providers did not get a chance to

16   bid on an impression offered through Google's Ad Manager until Google had passed on the

17   opportunity. After intense criticism, and years of economic harm to publishers, Google eventually

18   relinquished the feature in 2019.

19         107.    As a potential work-around, publishers responded by developing "header bidding," an

20   advanced method of display ad buying which allows publishers to offer their inventory to multiple

21   ad exchanges simultaneously. This gave every ad buyer an equal chance to bid on the same

22   inventory at the same time, leading to greater competition between bidders and more ad revenue for

23   publishers, fostering competition among ad exchanges and creating rivals to Google. Following the

24   adoption of header bidding, publisher revenue increased significantly – cost per thousand

25   impressions increased by 25%-50%.

26         108.    In response to this competitive threat, Google took aim at header bidding, introducing

27   an alternative it called "Open Bidding," which was integrated into its ad tech stack. Yet again,

28   Google's response was designed to suppress competition on the merits and favor itself over its

competitors.  When ads are sold through Google's "Open Bidding," there was an additional charge imposed by Google, usually 5% of the SSP's bid – raising rivals' costs, lowering payments to publishers, and advantaging Google.

109.    Another way in which Google sought to blunt this competitive threat and force "Open Bidding" adoption was through its design of Accelerated Mobile Pages ("AMP").  AMP, however, was technically designed to render websites built on the framework with header bidding incompatible with its applications, which created a *de facto* requirement for publishers to use AMP. Google also dropped the PageRank of sites that did not adopt AMP, maliciously rendering such sites nearly invisible to Google searches and starving publishers of the web traffic needed to create ad revenue and sustain their ad business.  As a result, publishers could not utilize header bidding without being penalized for doing so (both financially and through the inability of users to see/reach their sites), which substantially removed the financial benefit of competition on the merits that header bidding had provided to publishers.

110.    Google took additional steps to undermine header bidding and ensure that publishers using DoubleClick as their ad server increasingly relied on Google-controlled programmatic channels was the "minimum bid to win feature," which Google implemented in March 2019.  The "minimum bid to win" feature allowed buyers using Google's software (as opposed to header bidding offered by its rivals) to receive extra information that allowed them to adjust their bidding strategy and potentially buy the same inventory at a cheaper price.  The natural result was that buyers were driven to directly interact with and shift their budget to Google's Ad Manager rather than another exchange.

### 2.    Manipulative and Technological Blocking, Exclusion and Downgrading

111.    Google has engaged in manipulative and technological blocking, exclusion and downgrading of competitors' products.  Google has used its Ad Server to control how ads end up on websites and smartphone apps, through the Android OS, and has manipulated this control to give preference to Google's own stable of products and services.  Google has also used its Chrome Browser to force publishers and advertisers to comply with a host of arbitrary, unilaterally imposed

rules to – for example – allow their online videos to be enabled, viewable and audible on Google's dominant Chrome Browser, while it has effectively prevented competitor advertisements from being enabled. The reverse network effect caused when Google products work while competitors' products do not harms Sweepstakes Today and other publishers and competitors.

112. Google likewise inhibits interoperability between Google ad platforms and non-Google ad platforms, including as set forth above.

### 3. Denial of Interoperability and Purposeful Incompatibility

113. Google also engages in denying interoperability with competitors' products and services and purposefully renders certain of its products and services incompatible, which has excluded entry by competitors, raised their costs and costs to publishers, and coerced the use of Google products and services by publishers, advertisers and competing platforms. Between September 2018 and August 2019, for example, the aggregated value of the impressions won by Google Ads through AdX was several times that of impressions won through other third-party exchanges.

114. Google designed its exchange so that it operates more efficiently with requests from Google's own ad server than it does from rival exchanges, which has suppressed competition on the merits. Google's server can receive requests from, and submit bids to, other ad servers, but the Google server purposefully cannot easily put those requests into a real-time auction on equal footing with the requests from Google's own server. This lack of interoperability ensures that demand from advertisers for third-party display inventory through Google Ads is overwhelmingly channeled through Google's own exchange and disadvantages competing ad servers.

115. Additionally, in January 2020, even though it may lose some capabilities on its end, Google announced that it planned to phase out third-party cookies in Chrome, which has reinforced Google's power and harmed rivals and forced even more advertisers toward Google. In particular, while Google phases out third-party cookies needed by other digital advertising companies to effectively compete, Google can still rely on data collected throughout its digital ecosystem.

116. The cookie identifies the unique user, which allows participants in the ad tech stack to track consumers as they browse the web and cross the various functions involved in placing an ad.

Without the ability to identify a consumer and the ability to measure and track their action through third-party cookies, Google's rivals in the ad tech stack will not be able to bid efficiently – in effect, competing blindly with Google, who now has 20/20 vision.  Retiring third-party cookies thus raises the costs of Google's rivals and diminishes their effectiveness.  Google's dominance across markets and ability to capture user data in other ways means that Google will not be affected in the same way and will maintain the ability to target online advertising to individual users.

117.    Through its control of the data, Google has thwarted publisher efforts to understand the source of advertising payments.  For years, publishers could view the time stamps on advertising bid requests to match impression sales to bids and get a full view of their ad sales process, thereby allowing them to price their supply more accurately.  Google recently removed time-stamp data on bid requests, which lessens the ability of publishers and advertisers to evaluate their performance against Google's.

### 4.    Cross-Subsidizing Various Functions of the Ad Tech Stack and Predatory Pricing

118.    Google's ubiquitous practice of offering various free services on one side of the advertising technology stack it controls enables it to extract higher prices from the other side and to drive out rivals.  Google's market power allows it to raise prices on one end of the stack, while simultaneously lowering prices at the other end, which drives out rivals and makes entry into the market difficult.  By way of example, Google has implemented an anticompetitive strategy directed at the publisher end of the advertising technology stack.  After purchasing DoubleClick in 2008, Google lowered its prices to publishers by a factor of ten.  This, in turn, made entry into the market far more difficult, as such pricing pressure made it nearly impossible to sustain publisher ad server services as a standalone business.

119.    But this is not the only way in which Google has used its unique structural advantage to engage in competitive interference.  Users' "free" Internet search is paid for in billions of dollars of advertising revenue.  The "free" conversion of creatives into HTML5 meant Google could garner more advertisements through its own revenue generating ecosystem.  Likewise, the "free" Android

1   OS puts Google and its products and services in the hands of a vast majority of mobile users world-

2   wide.

3       120.    While Google touts that AdSense is a "free" service, website owners pay for this

4   "free" service by providing their own websites "real estate," *i.e.*, blank spaces on their websites that

5   Google can then populate with paid for advertising; by enabling Google to trade on their names,

6   goods and services; by driving web traffic to the Google platform; and by essentially providing

7   digital client lists to Google for further data mining and monetization.  Additionally, Google takes a

8   piece of the profit paid by the advertiser to the website owner.

9       121.    These free products and services are in essence predatory pricing and triangular

10  predatory pricing.  Only Google's dominance across markets enables these "free" offerings.  Other

11  market participants cannot compete.

12          **5.      Unilateral Setting and Altering of Technological Standards**

13      122.    By virtue of its dominance in the web browser market, Google can effectively set

14  standards for the industry through changes to Chrome's functionality, creating *de facto* standards (as

15  set forth above).  Market participants must adhere to these standards or risk their technology no

16  longer being compatible with most websites.[31]

17      123.    Google also coerces users into using Google services by changing and/or altering

18  algorithms to exempt Google-owned and Google-preferred platforms, products and services from the

19  onerous and arbitrary rules that enable or disable online videos from being viewed and heard by

20  users.

21      124.    Another example of Google's technical manipulation of the market is its course of

22  conduct pursued to monetize the transition from Adobe Flash advertising content to content based in

23  HTML5.  Flash is a digital software that was the standard for playing website video files for more

24  than a decade, and publishers used Flash because it gave them significant control and flexibility over

25  the user experience, including how and when videos played, whether a video would start

26  automatically when the web page loaded, and whether the video would be accompanied by audio.

27  ────────────────

28  [31]      House Antitrust Report at 229.

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT AND THE CLAYTON ACT     - 35

125.     Google's dominant Chrome Browser initially came with Flash pre-loaded, but beginning in or around 2014, Google began to roll out changes to Chrome designed to force advertisers to migrate to the Google advertising network and strip publishers of the control they had previously enjoyed. Google's conduct included using Chrome to significantly, technologically reduce the level of publisher control over ads that were supported by Adobe Flash, and later discontinuing use of Flash in Chrome entirely, unapologetically restricting advertiser and publisher options even further, despite the considerable concern at the time that HTML5 was not as versatile for users as Adobe Flash.  Advertisers and publishers that had creatives supported by Adobe Flash were forced to either migrate to the Google advertising network to reach target users or to engage in this arduous conversion process.  While the conversions were made or the creatives were being migrated to Google, publishers had to wait to monetize their websites, resulting in loss of substantial revenues.  Alternatively, the publisher could suspend or sever prior relationships with advertisers and utilize Google's platform to fill their inventory with Google's HTML5-ready creatives, substantially adding to Google's own advertising revenue, further harming advertisers and publishers by reducing the market competition.

126.     In this way, Google syphoned off customers from publishers, who were economically harmed, while Google and YouTube plundered valuable video advertisements that had supported publishers' websites.

127.     Also, in June 2015, Google Chrome began to "intelligently pause" ads that were supported by Adobe Flash.  Specifically, Chrome introduced features to automatically pause Flash content that was not "central to the webpage" while keeping central content playing without interruption.  For example, the main video that a user wanted to watch was unaffected while animations on the side, such as video advertising, were paused.  Google admitted knowing that the feature would stop video ads from playing, including "many Flash ads."  At the time there was considerable concern that HTML5 was not as versatile for users as Adobe Flash.  According to one commentator:

> The Flash-pause feature can be seen as yet another move by Google designed to increase digital dominance under the guise of a user benefit.  Google wants to maintain web monetization dominance . . . .

1                                    *       *       *

2          In the past, Google dealt with threats to its dominance by forcing publishers
   into exclusive deals.  Now, Google found a more subtle means to the same end:
3  developing features to "protect" users who don't understand how the web works.[32]





18         128.    Another way in which Google illegally leverages its monopoly power is through its

19  control of the functionality of HTML5 and operability of competitors' products, through, *inter alia*,

20  the Chrome Browser.

21         129.    HTML5 is open source technology and, as such, Google has used its monopoly

22  powers to not only set the rules for how HTML5 will function, but to be the self-declared enforcer of

23  how HTML5 operates.  When HTML5 is used to present video content, Google, through Chrome,

24  has significantly more control over how, when, and what videos are played.  For example, Google

25  controls whether a video will autostart and whether a video will play with the sound on or off.

26

27  [32]     *See* Vincent Meyer, *Google's New Flash Pause Tool — Are Video Ads Crippled?*, LinkedIn
   (June 18, 2015), https://www.linkedin.com/pulse/googles-new-flash-pause-tool-video-ads-crippled-
28  vincent-meyer/.

1    Google also controls the allowable size of the video player to enable compatibility and

2    interoperability with Chrome Browser and controls functionality such that Google allows autoplay

3    when it serves Google and shuts down competitors' video players.

4        130.    Moreover, certain Google-owned or preferred sites such as YouTube are white-listed,

5    and thus algorithmically exempt from the restrictive Chrome Browser settings.  Thus, Google and

6    YouTube ads can run automatically and uninterrupted.  This favorable treatment by Google and

7    YouTube cannot be overstated – as the very purpose of advertising is to be seen and to be heard by

8    the end user.  And, advertisers and brands will necessarily pay to go where they are sure to been seen

9    and heard by prospective customers.[33]

10       131.    Effectively, through Google's products and services, including their Ad Server and

11   Chrome Browser, Google can manipulate how, when and where ads are placed; how, where and

12   whether they are seen; how, where and whether they are heard; and how efficiently and effectively

13   they are delivered.  Moreover, as stated, these restrictive rules are altered and/or not in place for the

14   video advertisements that run in front of Google's own YouTube videos.  Advertisers, tracking the

15   efficacy of their ad spend, can tell where their video advertisements are seen and which publishers'

16   website to place ads on and which to forego.

17       132.    Additionally, Google has a monopoly in the Publishing and Advertising Ad Serving

18   Markets with a near 90% market share.  In order to use Google's AdX service, advertisers and

19   publishers are forced to use Google's Ad Server, Double Click for Publishers, which is programmed

20   to control how, when, where and to whom paid-for advertisements are served.[34]  Coupled with its

21

22

---

23   [33]     In the House Antitrust Report, it was noted that certain anticompetitive activities by Google
     could have a "'network effect in reverse.'"  *Id*. at 190.  That is, reduction in traffic led to fewer
24   consumers, which led to fewer listings, and less revenue, reduced investment and further decline. *Id.*
     In video advertising, a network effect in reverse means if it doesn't work customers stop using it.

25   [34]     Smaller, competing ad servers have noted: "'The ubiquity of Google's ad server provides
     virtually total control over which ads are shown and monetized for the majority of the Internet.  This
26   control of the ad server is strategically critical to Google.'"  Paresh Dave & Sheila Dang, *Explainer:*
     *Advertising execs point to five ways Google stifles business*, Reuters (Sept. 26, 2019),
27   https://www.reuters.com/article/us-tech-antitrust-google-explainer/explainer-advertising-execs-
     point-to-five-ways-google-stifles-business-idUSKBN1WB2Q1.
28

unparalleled user data, this unfairly advantages Google over Sweepstakes Today and other publishers and competitors.

### 6. Using Google's Significant Data Advantage to Disadvantage Competitors

133. As described above, Google has monopoly power over advertising and browser data and it has used this power to disadvantage its competitors and limit competition in the online advertising market. Google offers an entire family of products that gather valuable information about its users. In the digital advertising space, Google builds on this unmatched set of data through its data collection of consumer activities across the entire ad tech stack. A 2016 study found that Google had a tracking presence on 75% of the top one million sites – three times its nearest competitor (Facebook). More recent studies estimate a reach closer to 95%. While Google has access to a tremendous amount of online user data, it is generally difficult and costly for advertisers to assemble information on consumers from their own first-party data and other third-party data providers, and even then the data is not nearly as valuable as the data held by Google. Simply put, no competitor can even begin to match Google's ability to track consumers across the Internet and to create consumer profiles.

134. Google's extensive first-party data is a source of substantial advantage over smaller platforms and publishers, creating a barrier to entry for potential rivals across the entire ad tech stack and allowing the company to maximize the effectiveness of its ad targeting and attribution. Google does not provide access to this data on open data exchanges and restricts the use of this data to its own advertising tools. As a result, publishers are incentivized to use Google's advertising services, to maximize the effectiveness (and therefore, the value) of the digital space made available to advertisers. In doing so, however, publishers enable Google to obtain even more data, which only perpetuates Google's monopoly power and ability to deliver high performing ads. Google's data advantage becomes more difficult to overcome over time.

135. On top of that, Google also limits data sharing with third-party analytics and measurement tools, which hurts independent data providers, gives an advantage to Google's publisher and ad tech services, and suppresses competition.

136.     To further insulate itself from competition, Google also does not clearly reveal the fees it charges along the digital advertising technology chain.  Without this information, potential rivals along the chain cannot determine the most profitable service to enter, where they could provide a better price than Google.  Nor can publishers negotiate directly with advertisers in a way that might put competitive pressure on Google.

### 7.     Illegal Tying and Bundling of Services

137.     Google has engaged in illegal tying or bundling, including technological tying, of Google products and services, in a way that reduces its customers' willingness and ability to switch to rival products.   Specifically, Google has bundled and illegally tied the use of Google's DoubleClick Ad Server with the real-time bids from Google's AdX marketplace.

138.     Google and YouTube have also illegally tied the purchase of ads on YouTube, the world's largest video streaming website, with Google's own ad buying tools – including Google Ads, AdSense, AdX and now Google Ad Manager – which harms competitors by making rival tools for placing ads in video streams less attractive to advertisers who can only access smaller audiences. In this way, Google has leveraged control over YouTube to further foreclose competition by excluding competitors from having access to YouTube.[35]

139.     Google has further consolidated its market power through a series of product mergers, whereby Google bundled two distinct products together and rebranded the bundled products as a single integrated product.  Specifically, in June 2018, Google underwent a major "rebranding" of its ad platform.  Google has now tied its DFP Ad Server with AdX under a single tool, Google Ad Manager, as follows:

---

[35]     House Antitrust Report at 211.

## Google Rebranding Their Advertising Platform.

Google AdWords
will become
Google Ads



DoubleClick and the Google
Analytics 360 Suite
will become
Google Marketing Platform



DoubleClick for Publishers
and DoubleClick Ad Exchange
are becoming
Google Ad Manager



140.    This rebranding is essentially the express tying of services to further Google products and services.  By integrating and "rebranding" them into the Google Ad Manger, Google illegally and blatantly ties its stable of advertising services together and compels and coerces the use of Google services, forcing publishers and advertisers to use both products in order to have access to the other.

### 8.    Google Affirmatively Interferes with Competitors Using Data Harvested from Its Monopolies

141.    Google offers an entire family of products.  Google has touted that: "Our tools and platforms make it easy for advertisers and publishers of all sizes to choose whom they want to work with in this open, interconnected ad system."  In reality, Google collects market intelligence on its competitors and engages in anticompetitive conduct by directly interfering with its competitors' businesses.

142.    By using market intelligence from its monopolies on competitors and competing online advertising platforms, Google both directly and surreptitiously interferes with competitors' businesses and contracts and garners additional market share for Google.  Google's "near-perfect market intelligence" has been recognized as enabling Google to covertly set up programs to more closely track its potential and actual competitors.[36]

---

[36]    House Antitrust Report at 15.

### 9.   Preferential Treatment of Google Products and Services

143.   Beyond the actions described above, Google has taken several other anticompetitive measures designed to prioritize its own advertising services and afford its own products and services favorable treatment and deprive publishers of advertising revenue.

144.   Attribution is the process by which advertisers track consumers' exposure to their advertising across different websites and devices and link that exposure to specific actions taken by the consumer – for example, clicking through to the advertiser's website and purchasing a product. When a consumer sees multiple ads before taking action, however, Google sets the default attribution in its ad tech software to assign attribution to its own products (usually, search ads).  By doing this, the default attribution deceptively gives Google – rather the publisher and advertiser responsible for the display ad – credit for delivering the customer.  Not surprisingly, this default setting increases Google's profits while lowering payments to publishers for online ads, syphoning off profits from publishers in favor of Google.

145.   Google has also usuriously increased the cost of rival online video platforms' use of Google's goods and services, unilaterally terminating contracts with rival online advertising platforms and/or expressly or constructively refusing to deal and/or do business with competitors. Additionally, Google has contractually restricted small businesses from advertising on competing search platforms.

146.   Additionally, Google has taken part of the content of competing publisher sites and misappropriated such content by placing it in Google's own search results.  When competitors have objected, Google threatens to remove them entirely from Google's search results.[37]   Google's practice of misappropriating third-party content to bootstrap its own rival search services and to keep users on Google's own webpage has been cited by the House Judiciary Committee as further evidence of its monopoly power and an example of how Google has abused that power and harmed competition.[38]

---

[37]   House Antitrust Report at 185-87.

[38]   House Antitrust Report at 187.

147.  Moreover, Google is the default search provider on 87% of desktop browsers and the vast majority of mobile devices.  Specifically, Google has used its search dominance to promote the use of its Chrome Browser on laptops, personal computers, and workstations, which sets Google Search as its default.

148.  Google also pays Apple and others an undisclosed amount, estimated in Apple's case to be $12 billion per year, to secure the search default across iOS devices.  This self-preference favors Google because users tend to stick with the default presented.  Moreover, Google takes steps to hamper and dissuade even those users that do attempt to switch search engines on Chrome. Combined, Google's conduct significantly impedes other search providers from reaching users at scale – and further expands and entrenches Google's dominance.[39]

149.  In July, *The Wall Street Journal* reported that Google gives preferential treatment to defendant YouTube.  Tests conducted by *The Wall Street Journal* found that searching Google for videos delivered YouTube in results much more prominently than competing video providers, even when competitor videos had more engagement.  Reflecting interviews with those familiar with the matter, the piece stated that Google engineers: "[M]ade changes that effectively preference YouTube over other video sources . . . .  Google executives in recent years made decisions to prioritize YouTube on the first page of search results, in part to drive traffic to YouTube rather than to competitors, and also to give YouTube more leverage in business deals with content providers seeking traffic for their videos."[40]

### 10.  Exclusive Dealing and Anticompetitive Contracts

150.  Google engages in exclusive dealing and anticompetitive contracts that restrict competition.  With respect to Google ad offerings, Google insists on exclusivity by: (1) requiring the website owners that use AdSense not to allow search ads from Google's competitors to appear on the website; (2) requiring premium placement of a minimum number of Google search ads; (3) requiring

---

[39]     House Antitrust Report at 178.

[40]     Sam Schechner, et al., *Searching for Video? Google Pushes YouTube Over Rivals*, Wall St. J. (July 14, 2020), https://www.wsj.com/articles/google-steers-users-to-youtube-over-rivals-11594745232.

the website owners to allow a minimum number of search ads from Google to be displayed on the most prominent space on their search results pages; (4) prohibiting competing search ads from being placed above or next to Google search ads; and (5) establishing a right to authorize competing ads by requiring the website owners to obtain Google's approval before making any changes to display competing search ads.

151.    Google Ads also imposes obligations that prevent sellers and advertisers from managing search advertising campaigns across Google's AdWords and non-Google advertising services.  These obligations include, but are not limited to, various restrictions in the AdWords API terms and conditions.

152.    While anticompetitive conduct by the defendants with respect to any single market in which Google wields monopoly power runs afoul of the antitrust laws, the totality of defendants' illegal and anticompetitive conduct across multiple, inter-related markets is more insidious.

153.    On October 20, 2020, the DOJ filed an action against Google in which it stated that:

> 4.    For years, Google has entered into exclusionary agreements, including tying agreements, and engaged in anticompetitive conduct to lock up distribution channels and block rivals.  Google pays billions of dollars each year to distributors – including popular-device manufacturers such as Apple, LG, Motorola, and Samsung; major U.S. wireless carriers such as AT&T, T-Mobile, and Verizon; and browser developers such as Mozilla, Opera, and UCWeb – to secure default status for its general search engine and, in many cases, to specifically prohibit Google's counterparties from dealing with Google's competitors.  Some of these agreements also require distributors to take a bundle of Google apps, including its search apps, and feature them on devices in prime positions where consumers are most likely to start their internet searches.

> 5.    Google's exclusionary agreements cover just under 60% of all general search queries.  Nearly half the remaining queries are funneled through Google owned-and-operated properties (*e.g.*, Google's browser, Chrome).  Between its exclusionary contracts and owned-and-operated properties, Google effectively owns or controls search distribution channels accounting for roughly 80 percent of the general search queries in the United States.  Largely as a result of Google's exclusionary agreements and anticompetitive conduct, Google in recent years has accounted for nearly 90 percent of all general-search-engine queries in the United States, and almost 95 percent of queries on mobile devices.[41]

---

[41]    Complaint, ¶¶4-5, *United States v. Google LLC*, No. 1:20-cv-03010 (D.D.C. October 20, 2020).

154. Google's exclusionary agreements include, but are not limited to, the following: distribution agreements, anti-fragmentation agreements, mobile application distribution agreements, mobile incentive agreements, and revenue sharing agreements.

155. Google's distribution agreements come in three basic types, with the specific terms of each agreement depending upon the counterparty and the search access points at issue. First, Google requires Android device manufacturers that want to preinstall Google's proprietary apps to sign an anti-forking agreement; these agreements set strict limits on the manufacturers' ability to sell Android devices that do not comply with Google's technical and design standards.

156. Next, for Android device manufacturers that sign an anti-forking agreement, Google provides access to its vital proprietary apps and application program interfaces (APIs) for preinstallation, but only if the manufacturers contractually agree to: (1) take a bundle of other Google apps; (2) make certain apps undeletable; and (3) give Google the most valuable and important real estate on the default home screen.

157. Finally, Google provides a share of its search advertising revenue to Android device manufacturers, mobile phone carriers, competing browsers, and Apple; in exchange, Google becomes the preset default general search engine for the most important search access points on a computer or mobile device. As a practical matter, users rarely switch the preset default general search engine. In many cases, the agreements relating to mobile devices go even further, expressly prohibiting: (1) the preinstallation of any rival general search services; and (2) the setting of other defaults to rival general search engines. This means that Google is the only preset default search provider preinstalled on the device.

158. These agreements work exactly as Google designed them – to foreclose distribution to Google's search rivals, weakening them as competitive alternatives for consumers, publishers and advertisers by denying them scale. They also keep Google products and services in the hands of more consumers, which is a force multiplier of Google's monopoly power across markets garnering more online advertising profits to Google and enabling the other anticompetitive conduct set forth herein.

### 11.     Manipulation of the Patent Process

159.     As a technology company, the patent process is important to Google.  As set forth in ¶¶63, 67 and 73 above, over time Google acquired the patents of numerous companies, including ad tech companies and mobile device companies.  These patents have been used both to grow Google's monopolies (*e.g.*, as in the case of DoubleClick) and buried to keep companies from competing with Google (as in the case of the acquisition of Motorola and its attendant patents).

160.     A history of using its clout and market position to weaken the value of potentially competitive patents owned by others – and indeed prevent those patents from issuing in the first place – while steadily increasing and making use of its own massive portfolio has become a hallmark of Google.[42]  Without patent protection, the work and/or methods of potential start-ups, innovators and competitors can and has been used by Google.

161.     Additionally, in or around March 2015, Michelle Lee, the deputy general counsel at Google, left Google to become the Commissioner of the U.S. Patent and Trademark Office ("USPTO"), a position she held until June 2017.  Lee had significant influence on the policy and workings of the USPTO, such as instituting the procedures of the Patent Trial and Appeal Board and Inter Partes Review ("IPR"). IPRs themselves are designed to increase the likelihood that patents from smaller inventors will be invalidated.

162.     Google also avails itself of other procedures that work to its benefit.  For example, in 2014, Google was by far the largest recipient of patents that were expedited under the USPTO's Track One program, created by the American Invents Act, which allows companies to get their patent applications "fast-tracked" by paying extra fees, something that Google has no trouble doing.[43]

---

[42]     James Temple, *Google lawyer: Why the patent system is broken*, SFGate.com (Nov. 30, 2011), https://www.sfgate.com/business/article/Google-lawyer-Why-the-patent-system-is-broken-2324278.php; Michael Shore, *How Google and Big Tech Killed the U.S. Patent System*, IP Watchdog (Mar. 21, 2018), https://www.ipwatchdog.com/2018/03/21/how-google-and-big-tech-killed-the-u-s-patent-system/.

[43]     Catherine Ho, *Google has gotten more fast-track patents than any other company*, Wash. Post, Oct. 26, 2014, https://www.washingtonpost.com/business/capitalbusiness/google-has-gotten-more-fast-track-patents-than-any-other-company/2014/10/26/b39334b4-594f-11e4-b812-38518ae74c67_story.html.

## B. **Monopolistic Leveraging**

163.   Not only has it abused its monopoly power in the Online Advertising Market and related sub-markets, Google has leveraged its monopoly power in adjacent markets to suppress competition and harm publishers.

164.   Monopolistic leveraging is the use of monopoly power in one market to strengthen or gain a monopoly share in another market.   Leveraging may be achieved through many anticompetitive practices, including, but not limited to, contractual and/or technological tying, bundling, exclusive dealing, and predatory or below-cost pricing.   Monopolistic leveraging is often used to describe the way in which a monopolist in one market uses its power to monopolize or attempt to monopolize a second market.   In digital markets, the DOJ has noted that monopolistic leveraging and relationships between markets is as important as dynamics within the market, such as barriers to entry and market power.[44]

165.   Plaintiff alleges that monopoly leveraging by defendants includes, but is not limited to, the following:

a.   Google has leveraged its monopoly power in the Internet Search Market, the Licensable Mobile Device Operating System ("LMDOS") Market and the Search Advertising Market and its dominance in the Online Advertising Market to gain, and then maintain and exploit, its monopoly power in those markets; and

b.   Google has leveraged its monopoly power in the Ad Exchange and Advertising Serving markets and its dominance (and/or monopoly) in the

---

[44]    In a December 10, 2019 address to the National Association of Attorneys General, U.S. Attorney William Barr warned: "[I]n addition to understanding the dynamics within a market, like barriers to entry and market power, we also need to look at relationships between markets.  This is especially important because today's digital platforms frequently operate across multiple areas.  A dominant firm may seek to leverage its monopoly power in one market to gain an unfair advantage in another."   William Barr, U.S. Attorney General, U.S. Dep't of Just., Remarks at the National Association of Attorneys General 2019 Capital Forum (Dec. 10, 2019), https://www.justice.gov/opa/speech/attorney-general-william-p-barr-delivers-remarks-national-association-attorneys-general.

1       Web Browser Market in an attempt to gain monopoly power in the broader

2       Online Advertising Market.

3       166.    For example, Google leveraged its monopolies in online search, search advertising

4   and LMDOS to require default installation and global dissemination of its Chrome Browser.

5       167.    In turn, Chrome Browser now serves as a way for Google to control the entry points

6   for its core markets: online search and online advertising, including online video advertising.[45]

7   Moreover, both Chrome Browser and Google's Ad Server control the delivery, functioning and

8   operability of online advertising, including online video advertising and competing online

9   advertising technology.

10      168.    The House Subcommittee on Antitrust, Commercial and Administrative Law ("House

11  Antitrust Subcommittee") found that Google repeatedly leveraged its monopoly power to maintain

12  and gain dominance across related markets.[46] Specifically, the House Antitrust Subcommittee found

13  that:

14          Google used its search engine dominance and control over the Android
            operating system to grow its share of the web browser market and favor its other
15          lines of business. ***Reciprocally***, Chrome's dominance in the browser market gives it
            significant gatekeeper power over managing and monitoring users' browsing activity
16          – power Google can wield to shape outcomes ***across markets*** for search, mobile
            operating systems, and digital advertising.  These advantages across markets feed
17          back into and reinforce one another, advantages that [competitors] lack.[47]

18      169.    Google also leverages its monopoly in its Android OS to maintain its monopoly

19  power and attempt to gain further monopoly power.

20      170.    Google has obtained default placement of both its Google Search and Chrome

21  Browser across the mobile and desktop ecosystem through both integration and contractual

22  arrangements.  Through its ownership and complete control of Android, Google has been able to

23

24

25

26  [45]     House Antitrust Report at 224.

27  [46]     House Antitrust Report at 15, 183-87, 193, 211, 215, 217, 246.

28  [47]     House Antitrust Report at 225 (emphasis added).

1  ensure that Google Search remains dominant even as mobile replaced desktop as the critical entry

2  point to the Internet.[48]

3      171.    Google has required that any smartphone manufacturer seeking to license Android

4  preinstall Google Search and Google Play Store, alongside a host of other apps selected by Google.

5  Google has also offered mobile device manufacturers revenue-share agreements, under which

6  smartphone manufacturers would receive a cut of the search advertising revenue that Google made

7  from the use of Google's apps on their devices, as well as a cut of Google Play Store revenues.  In

8  return, however, manufacturers had to not only carry Google's apps, but also ensure that Google

9  Search was the default ***and*** exclusive search app pre-installed on the manufacturers' devices.[49]

10  Moreover, Google has established Chrome as the default browser on the majority of Android

11  devices.  This further feeds Google's preestablished rules and parameters for enabled, viewable, and

12  audible online video advertisements and use of HTML5 and disadvantages Sweepstakes Today and

13  other competitors.

14      172.    The illegal ties, restrictive agreements, self-preference and promotion of Chrome and

15  Google Search through its Android OS, maintains and enhances Google's ability to provide

16  preferential placement of its own advertising products and services to the detriment of Sweepstakes

17  Today and other Google competitors.

18  **IX.    INTERSTATE TRADE AND COMMERCE**

19      173.    Google's conduct as alleged herein has had a substantial effect on interstate and

20  intrastate commerce.  At all material times, Google participated in the conduct set forth herein in a

21  continuous and uninterrupted flow of commerce across state and national lines and throughout the

22  United States.

23  **X.    ANTITRUST HARM**

24      174.    Defendants' conduct goes far beyond aggressive competition.  Defendants'

25  anticompetitive and predatory actions intend to, and in fact do, exclude rivals and harm the

26  ----

[48]    House Antitrust Report at 181.

27  [49]    House Antitrust Report at 213 (referencing documents provided by Google, including the

28  March 2011 Mobile Application Distribution Agreement).

1   competitive process. The conduct is not competition on the merits or otherwise privileged. Worse

2   yet, the conduct has been systematically planned and thoroughly executed over many years; it is

3   willful.

4       175.    Defendants' conduct harms consumers by depriving customers of valid competitive

5   choice, degrading consumer privacy, degrading quality and variety of products and services offered

6   to consumers, stifling innovation and ultimately raising the prices of goods and services in the

7   marketplace.

8       176.    Defendants' conduct harms competition in each of the relevant markets by artificially

9   and unlawfully reducing and foreclosing competition, foreclosing competitors from meaningfully

10  participating in purportedly neutral and unbiased competitive processes, including the ad auction and

11  bidding processes, which are in fact skewed and rigged to favor Google and Google products and

12  services, and surreptitiously altering algorithms and compatibilities with competing platforms.

13      177.    Defendants' conduct adversely affects competition and innovation in each of the

14  relevant markets, including by:

15          (a)    Impairing the incentive of Google's competitors and potential competitors to

16  undertake research and development, because they know that Google will be able to limit the

17  rewards from any resulting innovation;

18          (b)    Impairing the ability of Google's competitors and potential competitors to

19  obtain financing for research and development;

20          (c)    Inhibiting Google's competitors that nevertheless succeed in developing

21  promising innovations from effectively marketing their improved products to customers;

22          (d)    Reducing the incentive and ability of advertising platforms, web application

23  developers, and other competitors to innovate and differentiate their products in ways that will

24  appeal to customers; and

25          (e)    Reducing competition and the spur to innovation by Google and others that

26  only competition can provide.

27      178.    The purpose and effect of defendants' conduct has been, and if not restrained, will be:

28

(a)   To preclude competition on the merits between competing online advertising platforms, advertisers, publishers seeking advertising space and websites offering their "real estate" for ad placement;

(b)   To preclude competition on the merits between Google's search and browser apps and other apps;

(c)   To preclude potential competition between Google's Android OS and competing operating systems, other companies, and software apps whose use is facilitated by bundled Google products and services, which systems could otherwise choose to offer competing Internet and advertising platforms; and

(d)   To maintain and extend Google's numerous monopolies, including Internet Search, Search Advertising, and Online Advertising monopolies.

179.   In light of the synergistic effect that defendants have acquired from their antitrust activities in the Internet Search Market, the Search Advertising Market, the LMDOS Market, and the Ad Serving Market – all connected by an Internet platform that enables Google to gather and monetize massive consumer and competitor data for its targeted and location-specific advertising (which accounts for about 83% of Alphabet's total revenue) – Google's conduct has resulted in real harm to competition, consumers, and innovation in each of the relevant markets.

180.   In addition to economic harm in fact to customers and competitors, the exclusion of competitors from competition on the merits, and harm to consumers from thwarting competition on the merits, Google's conduct also increases costs in distribution of products and services in the relevant markets; abuses its gatekeeping function and increases cost of market access across markets; and causes reverse network effects that result when Google's products and services are prominent and properly functioning, while competitors' are downgraded and unlawfully shut down by Google.

181.   Google's systematic and predatory conduct across markets threatens to change the trajectory of digital and online competition permanently.  As has been recognized, "because it can be

1  so difficult for courts to restore competition once it has been lost, the true cost of exclusion to

2  consumer welfare – and its benefit to dominant firms – are likely to be understated."[50]

3  **XI.    PRIOR ANTITRUST ENFORCEMENT ACTIONS**

4      182.    As noted above, in October 2020, the DOJ filed a civil complaint against Google for

5  monopolization in the markets for search advertising and general search text advertising.

6      183.    Google's actions have repeatedly drawn scrutiny from governmental authorities.  The

7  FTC investigated Google's role in search and advertising markets, culminating in a staff

8  recommendation to file a complaint against Google – although the FTC ultimately decided not to do

9  so.  At various points over the last decade, Mississippi, Missouri, and Texas have each separately

10  investigated Google for antitrust violations, and, in September 2019, attorneys general from 50 U.S.

11  states and territories announced that they were opening a fresh antitrust inquiry into the search and

12  advertising giant.  These ongoing U.S. investigations follow multiple antitrust inquiries worldwide,

13  as well as antitrust-related penalties levied on Google by the European Commission, France, India,

14  and Russia.[51]

15  **XII.    PLAINTIFF WAS INJURED AS A RESULT OF GOOGLE'S
          ANTICOMPETITIVE ACTIONS**

16

17      184.    Over the past ten years, the online advertising market has seen tremendous year-over-

18  year growth.  In 2016, Internet advertising revenues in the United States totaled $72.5 billion for the

19  full year, which was an increase of 21.8% over 2015.  In 2017, online advertising revenues in the

20  United States reached $88 billion, with a growth rate of 21.4% relative to 2016.  Between the first

21  quarter of 2018 and the first quarter of 2019, advertising revenue growth was 17.2%.  The increase

22  in revenue from this growth, however, has not been shared by publishers and, in fact, many have

23  seen a decrease in revenue.

24      185.    Google has abused its monopolist position to harm publishers in many ways,

25  including by using anticompetitive measures to steer more valuable advertising content to its own

26  ─────────────

27  [50]    Andrew I. Gavil, *Exclusionary Distribution Strategies by Dominant Firms: Striking a Better Balance*, 72 Antitrust L.J. 3, 33 (2004).

28  [51]    House Antitrust Report at 176.

1    properties and away from competing publishers, and when publishers are able to secure ad

2    placements, Google has been able to depress bids and payments to publishers for placing ads on their

3    websites below what those publishers would receive in a competitive market, thereby increasing its

4    profits at the expense of publishers.

5          186.    Google has a strong incentive to disadvantage publishers in the supply of advertising

6    space so that it can capture the entire ad spend for itself. One way that Google has harmed

7    publishers is by implementing technological changes that send users to content based on pages

8    hosted by Google and away from competing publishers. In so doing, Google is able to capture all of

9    the ad dollars that would otherwise go to publishers.

10         187.    In steering these ad dollars to its own properties, Google is also consolidating its grip

11    over the advertising market and eroding competition for the supply of advertising by denying

12    publishers access to valuable data about these users. Without the ability to access this data,

13    publishers are unable to target users and maximize the value of their supply. Advertisers are, in turn,

14    less willing to pay premium prices to publishers, who are now providing lower quality services.

15         188.    For advertisements that Google is unable to steer into its own properties, it has been

16    able to use its monopoly power to depress payments to publishers so that Google can capture more

17    of the advertising fee than it would in a competitive market.

18         189.    As discussed above, advertisers work with demand side (advertising) platforms to buy

19    publishers' ad inventory through supply side (publisher) platforms. When digital advertising is sold

20    and purchased, various service intermediaries involved in the sale and purchase of the advertising

21    inventory (such as Google) collect revenue by charging a fee that is levied on the initial advertiser's

22    expenditure. In some cases, these fees are levied as a percentage deduction or commission from the

23    overall expenditure, whereas in other cases they are levied as a specific charge.

24         190.    In the digital advertising market, service providers such as Google collect revenue by

25    charging a fee as a percent of transacted dollars. These fees, which are collected before they reach a

26    publisher, are often called the "ad tech tax" or "take rate."

27         191.    The higher the take rate, the less a publisher collects from the fee paid by the

28    advertiser. For instance, if 20% of the advertising fee goes to providers in the ad tech chain,

publishers receive the remaining 80% of the total ad expenditure. Many publishers rely on their portion of the advertising fee as the primary source of revenue for their business model. Publishers who receive less than competitive rates invest less in their business, thereby degrading the quality of the content they are able to provide on their websites and applications (which, in turn, hurts advertisers and consumers).

192. Estimates by numerous industry sources have found that the "take rate" for display advertising is inflated in comparison to "take rates" in non-programmatic markets. In a 2018 study, the Association of National Advertisers found 35%-55% of ad spending in digital advertising goes to ad tech players, meaning that publishers were only capturing 40%-60% of overall ad expenditures.

193. In December 2019, the Competition and Markets Authority, a governmental department in the United Kingdom that is responsible for strengthening business competition and preventing and reducing anticompetitive activities, reached a similar conclusion after a six-month inquiry into online platforms and digital advertising. Drawing on four different data sources, the Competition and Markets Authority estimated Google's average "take rate" by its main advertiser and publisher-facing intermediaries. It calculated an average ad server/SSA fee of 22% and a weighted DSP fee of 18% – making the overall "take rate" for matching advertisers to publishers 40% of the total ad spend. These findings ultimately led it to conclude that "the fact that intermediaries are able to take more than a third of the total amount paid by advertisers raises legitimate concerns about whether the intermediation chain is operating efficiently." It added that "competition [in the digital advertising space] would drive greater innovation and put downward pressure on fees."

## XIII. CLASS ACTION ALLEGATIONS

194. Plaintiff brings this action individually and as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking monetary damages on behalf of the following class (the "Class"):

> All persons and entities who sold digital advertising space at any time during the period from December 15, 2016 through the present (the "Class Period").

Excluded from the Class are defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this complaint, and the United States government.

195.   Members of the Class are so numerous that joinder is impracticable.  Further, the Class is readily identifiable from information and records in defendants' possession.

196.   Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and all members of the Class were damaged by the same wrongful conduct by defendants as a result of defendants' wrongful conduct.

197.   Plaintiff will fairly and adequately protect and represent the interests of the Class.  Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

198.   Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation and have particular experience with class action antitrust litigation in the online advertising industry.

199.   Questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual Class members because defendants have acted on grounds generally applicable to the entire Class.  Such generally applicable conduct is inherent in defendants' wrongful conduct.  Questions common to the members of the Class include:

> (a)   whether defendants unlawfully acquired, maintained and extended their monopoly power in the relevant markets;

> (b)   whether defendants engaged in unlawful tying;

> (c)   whether defendants engaged in exclusive dealing;

> (d)   whether defendants leveraged their monopoly power in related markets to harm plaintiff and members of the Class;

> (e)   whether a relevant market needs to be defined in light of the existence of direct evidence of defendants' power to exclude competition;

> (f)   if a relevant market needs to be defined, the definition of the relevant market for analyzing defendants' monopoly power, and whether defendants had monopoly power in the relevant market(s);

(g)     whether the activities of defendants as alleged herein have substantially affected interstate commerce;

(h)     whether the conduct engaged in by defendants has harmed and/or not benefitted consumers; and

(i)     whether, and to what extent, defendants' conduct caused antitrust injury, and if so, the appropriate measure of damages.

200.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

201.    Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## XIV.   CLAIMS

**COUNT I**

**Violation of Sherman Act §2**
**(Monopolization)**

202.    Plaintiff incorporates and realleges all paragraphs in this complaint as though fully set forth below.

203.    As detailed in ¶¶77-86 above, defendants have monopoly power in the relevant markets.

204.    Through Defendants' Anticompetitive Restraints described in ¶¶99-172 above, defendants have willfully maintained and extended, and unless restrained by the Court will continue to willfully maintain and extend, that power by anticompetitive, illegal, deceptive, and unreasonably exclusionary conduct.  Defendants have acted with the intent illegally to maintain and extend their

1    monopoly power in each of the relevant markets, and their illegal conduct has enabled them to do so

2    in violation of §2 of the Sherman Act, 15 U.S.C. §2.

3           205.    There is no valid procompetitive business justification for defendants' anticompetitive

4    conduct, and to the extent defendants offer one, it is pre-textual and not cognizable. Any

5    procompetitive benefits of defendants' conduct do not outweigh the anticompetitive harms.

6           206.    As a direct and proximate result of Defendants' Anticompetitive Restraints, plaintiff

7    and members of the Class have suffered injury to their business and property throughout the Class

8    Period. The precise amount of damages plaintiff is entitled to recover as a result of the foregoing

9    injuries is substantial and will be fully ascertained at trial.

10          207.    In addition, defendants' monopolization of the relevant markets is an ongoing wrong

11   that causes incalculable and irreparable injury for which there is no adequate remedy at law. Unless

12   defendants are enjoined by an appropriate order of this Court, the asserted harm will continue

13   unabated.

14                                          **COUNT II**

15                               **Violation of Sherman Act §2**
                                         **(Unlawful Tying)**
16

17          208.    Plaintiff incorporates and realleges all paragraphs in this complaint as though fully set

18   forth below.

19          209.    As detailed in ¶¶77-86 above, defendants have monopoly power in the relevant

20   markets.

21          210.    As described in ¶¶137-140 above, defendants have engaged in illegal tying or

22   bundling, including technological tying, of Google products and services, including through

23   bundling and illegally tying the use of Google's DoubleClick Ad Server with the real-time bids from

24   Google's AdX marketplace.

25          211.    Defendants engaged in unlawful tying with the specific intent to monopolize the

26   Online Advertising Market in the United States, in violation of §2 of the Sherman Act, 15 U.S.C. §2.

27

28

212.     There is no valid procompetitive business justification for defendants' anticompetitive conduct, and to the extent defendants offer one, it is pre-textual and not cognizable.   Any procompetitive benefits of defendants' conduct do not outweigh the anticompetitive harms.

213.     The goal, purpose and/or effect of defendants' conduct was to maintain and extend defendants' monopoly power.

214.     As a direct and proximate result of Defendants' Anticompetitive Restraints, publishers and members of the Class have suffered injury to their business and property throughout the Class Period.  The precise amount of damages plaintiff is entitled to recover as a result of the foregoing injuries is substantial and will be fully ascertained at trial.

215.     In addition, defendants' monopolization of the relevant markets is an ongoing wrong that causes incalculable and irreparable injury for which there is no adequate remedy at law.  Unless defendants are enjoined by an appropriate order of this Court, the asserted harm will continue unabated.

**COUNT III**

**Violation of Sherman Act §2**
**(Exclusive Dealing)**

216.     Plaintiff incorporates and realleges all paragraphs in this complaint as though fully set forth below.

217.     As detailed in ¶¶77-86 above, defendants have monopoly power in the relevant markets.

218.     Defendants have willfully and intentionally entered into anticompetitive, exclusionary, and unjustified agreements with publishers, advertisers, original equipment manufacturers, and others, creating high barriers to entry and unreasonably excluding competition in the attendant markets as described in ¶¶150-158 above.

219.     Defendants engaged in unlawful exclusive dealing with the specific intent to monopolize the Online Advertising Market in the United States in violation of §2 of the Sherman Act, 15 U.S.C. §2.

220.    This web of exclusive dealing agreements cannot be justified by any purportedly procompetitive purpose; thus Google's exclusive dealing arrangement agreements are not only unduly restrictive and unreasonable in length, but also serve the anticompetitive purpose of cutting competitors off from resources they need to compete with Google.

221.    This conduct has substantially foreclosed competition in the relevant markets.

222.    These exclusionary agreements violate §2 of the Sherman Act, 15 U.S.C. §2, because these agreements constitute anticompetitive acts intended to maintain Google's monopoly.

223.    As a direct and proximate result of Defendants' Anticompetitive Restraints, publishers and members of the Class have suffered injury to their business and property throughout the Class Period.  The precise amount of damages plaintiff is entitled to recover as a result of the foregoing injuries is substantial and will be fully ascertained at trial.

**COUNT IV**

**Violation of Sherman Act §2**
**(Monopoly Leveraging)**

224.    Plaintiff incorporates and realleges all paragraphs in this complaint as though fully set forth below.

225.    Defendants have monopoly power in each the Internet Search Market, the Search Advertising Market, and the LMDOS Market, as set forth above in ¶¶77-86 above.  Through the anticompetitive conduct described herein, defendants have leveraged each of these markets in an effort to gain monopoly power and further dominance in the Online Advertising Market.  Defendants have done so willfully, and unless restrained by the Court, will continue to willfully leverage that power by further anticompetitive, illegal, deceptive, and unreasonably exclusionary conduct (Defendants' Anticompetitive Restraints) as described in ¶¶99-172 above.  Defendants have acted with the intent illegally to maintain and gain monopoly power in each of these markets, and their illegal conduct has enabled them to do so in violation of §2 of the Sherman Act.

226.    Defendants have used and leveraged their monopoly power and dominance in Google Search, the Internet Search Market, the Search Advertising Market, and the LMDOS Market to

anticompetitively and illegally disadvantage and harm plaintiff and other competitors in the Online Advertising Market.

227.     As a direct and proximate result of Defendants' Anticompetitive Restraints as set forth in ¶¶99-172 above, plaintiff and members of the Class have suffered injury to their business and property throughout the Class Period.

228.     Defendants' illegal conduct has directly caused significant monetary damages to plaintiff.  The precise amount of damages plaintiff is entitled to recover as a result of the foregoing injuries is substantial and will be fully ascertained at trial.

229.     In addition, defendants' monopolization of the relevant markets and monopoly leveraging are ongoing wrongs that cause incalculable and irreparable injury for which there is no adequate remedy at law.  Unless defendants are enjoined by an appropriate order of this Court, the asserted harm will continue unabated.

## COUNT V

### Violation of Sherman Act §2
### (Attempted Monopolization)

230.     Plaintiff incorporates and realleges all paragraphs in this complaint as though fully set forth below.

231.     As detailed in ¶¶77-86 above, defendants have monopoly power in the relevant markets.

232.     Defendants have attempted to monopolize multiple markets, including the Online Advertising Market, in violation of §2 of the Sherman Act, 15 U.S.C. §2.

233.     Defendants are violating §2 of the Sherman Act by attempting to implement the anticompetitive scheme, as described in ¶¶99-172 above.  There is a dangerous probability that defendants will succeed in monopolizing the relevant product markets through their anticompetitive scheme.

234.     Defendants have the power to exclude competition in the Online Advertising Market and have used that power, including by way of their unlawful practices in restraint of trade and monopoly leveraging as described above, in an attempt to monopolize these relevant markets.

235.    Defendants have the specific intent to achieve monopoly power in the Online Advertising Market and the other relevant antitrust markets.

236.    There is no business necessity or other procompetitive justification for defendants' conduct.

237.    Plaintiff has been injured, and will continue to be injured, in its business and property by way of defendants' conduct, including by depriving plaintiff and other publishers of revenue and advertising fees and shutting them out of meaningful and fair participation in the Online Advertising Market.

## COUNT VI

### Violation of Clayton Act §3
### (Exclusive Dealing and Tying)

238.    Plaintiff incorporates and realleges all paragraphs in this complaint as though fully set forth below.

239.    As detailed in ¶¶77-86 above, defendants have monopoly power in the relevant markets.

240.    Defendants have willfully and intentionally entered into anticompetitive, exclusionary, and unjustified agreements with publishers, advertisers, original equipment manufacturers, and others, creating high barriers to entry and unreasonably excluding competition in the attendant markets as set forth above in ¶¶137-140 and 150-158.

241.    These exclusive dealing agreements and tying of products as described above are unreasonably restrictive in terms of breadth, duration and market coverage.

242.    This web of exclusive dealing agreements cannot be justified by any purportedly procompetitive purpose; thus Google's exclusive dealing arrangement agreements are not only unduly restrictive and unreasonable in length, but also serve the anticompetitive purpose of cutting competitors off from resources they need to compete with Google.

243.    This conduct has substantially foreclosed competition in the relevant markets.

244.    These exclusionary agreements violate §3 of the Clayton Act, 15 U.S.C. §14, because these agreements constitute anticompetitive acts intended to maintain defendants' monopolies, including in the Online Advertising Market.

245.    As a direct and proximate result of defendants' anticompetitive and monopolistic conduct, plaintiff and other members of the Class have been damaged in fact.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays that the Court enter a final judgment against each defendant as follows:

A.    That the Court certify this lawsuit as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure; that plaintiff be designated as a representative for the Class, and that plaintiff's counsel be appointed as counsel for the Class;

B.    That the unlawful conduct alleged herein be adjudged and decreed to violate §2 of the Sherman Act, 15 U.S.C. §2, and §3 of the Clayton Act, 15 U.S.C. §14;

C.    That defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from, in any manner, continuing, maintaining or renewing the conduct alleged herein, or from entering into any other contract or engaging in any other conduct having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect.

D.    An award of monetary damages, including treble damages, punitive damages, the costs of this action, and reasonable attorneys' fees pursuant to §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26;

E.    An award of pre-judgement and post-judgement interest at the highest legal rate from and after the date of service of this complaint to the extent provided by law; and

F.    An award of such other relief as may be appropriate and as the Court may deem proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues herein.

DATED: December 15, 2020

ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIEL J. PFEFFERBAUM


          *s/ Daniel J. Pfefferbaum*
          DANIEL J. PFEFFERBAUM

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
dpfefferbaum@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID W. MITCHELL
STEVEN M. JODLOWSKI
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
davidm@rgrdlaw.com
sjodlowski@rgrdlaw.com

HERMAN JONES LLP
JOHN C. HERMAN
3424 Peachtree Road, N.E., Suite 1650
Atlanta, GA  30326
Telephone:  404/504-6555
404/504-6501 (fax)
jherman@hermanjones.com

Attorneys for Plaintiff

# EXHIBIT B

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

SWEEPSTAKES TODAY, LLC, Individually and on Behalf of All Others Similarly Situated

**DEFENDANTS**

GOOGLE LLC, ALPHABET INC. and YOUTUBE, LLC,

**(b)** County of Residence of First Listed Plaintiff     Tulsa, Oklahoma
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Daniel J. Pfefferbaum, Robbins Geller Rudman & Dowd LLP
One Montgomery Street, Suite 1800, San Francisco, CA  94104  415/288-4545

Attorneys *(If Known)*

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                  *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated *or* Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated *and* Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☒ 410 Antitrust |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | **LABOR** | 820 Copyrights | 430 Banks and Banking |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 710 Fair Labor Standards Act | 830 Patent | 450 Commerce |
| 151 Medicare Act | 340 Marine | **PERSONAL PROPERTY** | 720 Labor/Management Relations | 835 Patent—Abbreviated New Drug Application | 460 Deportation |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability | 370 Other Fraud | 740 Railway Labor Act | 840 Trademark | 470 Racketeer Influenced & Corrupt Organizations |
| | 350 Motor Vehicle | 371 Truth in Lending | 751 Family and Medical Leave Act | 880 Defend Trade Secrets Act of 2016 | 480 Consumer Credit |
| 153 Recovery of Overpayment of Veteran's Benefits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | 790 Other Labor Litigation | **SOCIAL SECURITY** | 485 Telephone Consumer Protection Act |
| 160 Stockholders' Suits | 360 Other Personal Injury | 385 Property Damage Product Liability | 791 Employee Retirement Income Security Act | 861 HIA (1395ff) | 490 Cable/Sat TV |
| 190 Other Contract | 362 Personal Injury -Medical Malpractice | | **IMMIGRATION** | 862 Black Lung (923) | 850 Securities/Commodities/ Exchange |
| 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 462 Naturalization Application | 863 DIWC/DIWW (405(g)) | 890 Other Statutory Actions |
| 196 Franchise | 440 Other Civil Rights | **HABEAS CORPUS** | 465 Other Immigration Actions | 864 SSID Title XVI | 891 Agricultural Acts |
| **REAL PROPERTY** | 441 Voting | 463 Alien Detainee | | 865 RSI (405(g)) | 893 Environmental Matters |
| 210 Land Condemnation | 442 Employment | 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | 895 Freedom of Information Act |
| 220 Foreclosure | 443 Housing/ Accommodations | 530 General | | 870 Taxes (U.S. Plaintiff or Defendant) | 896 Arbitration |
| 230 Rent Lease & Ejectment | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | 871 IRS–Third Party 26 USC § 7609 | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 240 Torts to Land | 446 Amer. w/Disabilities–Other | **OTHER** | | | 950 Constitutionality of State Statutes |
| 245 Tort Product Liability | 448 Education | 540 Mandamus & Other | | | |
| 290 All Other Real Property | | 550 Civil Rights | | | |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V.  ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from Another District *(specify)*   ☐ 6 Multidistrict Litigation–Transfer   ☐ 8 Multidistrict Litigation–Direct File

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. §2

Brief description of cause:
COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT AND THE CLAYTON ACT

## VII.  REQUESTED IN COMPLAINT:

✓ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ☐ No

## VIII.  RELATED CASE(S), IF ANY *(See instructions):*

JUDGE  James Donato

DOCKET NUMBER  3:20-cv-05761-JD

## IX.  DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

(Place an "X" in One Box Only)   ☒ SAN FRANCISCO/OAKLAND   ☐ SAN JOSE   ☐ EUREKA-MCKINLEYVILLE

**DATE**  12/15/2020

**SIGNATURE OF ATTORNEY OF RECORD**   s/ Daniel J. Pfefferbaum

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-CAND 44

**Authority For Civil Cover Sheet.** The JS-CAND 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I. a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**b) County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**c) Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)."

**II. Jurisdiction.** The basis of jurisdiction is set forth under Federal Rule of Civil Procedure 8(a), which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

(1) <u>United States plaintiff</u>. Jurisdiction based on 28 USC §§ 1345 and 1348. Suits by agencies and officers of the United States are included here.

(2) <u>United States defendant</u>. When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

(3) <u>Federal question</u>. This refers to suits under 28 USC § 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

(4) <u>Diversity of citizenship</u>. This refers to suits under 28 USC § 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. **(**See Section III below; **NOTE: federal question actions take precedence over diversity cases.)**

**III. Residence (citizenship) of Principal Parties.** This section of the JS-CAND 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV. Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V. Origin.** Place an "X" in one of the six boxes.

(1) <u>Original Proceedings</u>. Cases originating in the United States district courts.

(2) <u>Removed from State Court</u>. Proceedings initiated in state courts may be removed to the district courts under Title 28 USC § 1441. When the petition for removal is granted, check this box.

(3) <u>Remanded from Appellate Court</u>. Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

(4) <u>Reinstated or Reopened</u>. Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

(5) <u>Transferred from Another District</u>. For cases transferred under Title 28 USC § 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

(6) <u>Multidistrict Litigation Transfer</u>. Check this box when a multidistrict case is transferred into the district under authority of Title 28 USC § 1407. When this box is checked, do not check (5) above.

(8) <u>Multidistrict Litigation Direct File</u>. Check this box when a multidistrict litigation case is filed in the same district as the Master MDL docket.

<u>Please note that there is no Origin Code 7</u>. Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI. Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC § 553. Brief Description: Unauthorized reception of cable service.

**VII. Requested in Complaint.** <u>Class Action</u>. Place an "X" in this box if you are filing a class action under Federal Rule of Civil Procedure 23.

<u>Demand</u>. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

<u>Jury Demand</u>. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII. Related Cases.** This section of the JS-CAND 44 is used to identify related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**IX. Divisional Assignment.** If the Nature of Suit is under Property Rights or Prisoner Petitions or the matter is a Securities Class Action, leave this section blank. For all other cases, identify the divisional venue according to Civil Local Rule 3-2: "the county in which a substantial part of the events or omissions which give rise to the claim occurred or in which a substantial part of the property that is the subject of the action is situated."

**Date and Attorney Signature.** Date and sign the civil cover sheet.